**FUJITSU GENERAL LIMITED,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Slip Op. 95–44.**
**Court No. 91–03–00187.**

United States Court of
International Trade.

March 14, 1995.

Siegel, Mandell & Davidson, P.C., New York City (Brian S. Goldstein and Paul A. Horowitz), for plaintiff Fujitsu Gen. Ltd.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice (Michael S. Kane), of counsel, Robert J. Heilferty, Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

## OPINION

MUSGRAVE, Judge.

Plaintiff Fujitsu General Limited ("Fujitsu") a Japanese producer and importer of television receivers, contests the final results of the eighth, ninth, and eleventh administrative reviews of television receivers, monochrome and color, from Japan announced by the International Trade Administration, U.S. Department of Commerce ("ITA" the "Department" or "Commerce"): *Television Receivers, Monochrome and Color, From Japan, Final Results of Antidumping Duty Administrative Reviews*, 56 Fed.Reg. 5,392 (February 11, 1991) (*"Final Results"*), as modified by the *Final Results of Redetermination Pursuant to Court Remand* ("*Remand Determination*") filed with the Court on March 28, 1994.

### Background

Following the filing of *Plaintiff's Memorandum In Support Of Motion For Judgment Upon The Agency Record* ("*Plaintiff's Memorandum*") on December 11, 1992, challenging the administrative determination in the *Final Results*, Commerce filed a motion on April 27, 1993 requesting that this case be remanded with respect to seven issues raised in *Plaintiff's Memorandum*. The seven issues remanded to Commerce for further consideration were: (1) Commerce's treatment of Fujitsu's selling, general, and administrative expenses as not being inclusive of discounts and rebates; (2) Commerce's calculation of the selling, general, and administrative expense ratio; (3) Commerce's determination to exclude from foreign market value certain home market sales alleged to be below cost of production; (4) Commerce's use of model VA–191.S as a home market comparison model for certain months; (5) Commerce's failure to compare certain purchase price sales to a contemporaneous weighted-average home market price; (6) Commerce's calculation of foreign inland insurance amounts for exporter's sales price transactions; and (7) certain clerical, ministerial, and programming errors.

Fujitsu concurs with the *Remand Determination* except for Commerce's decision to exclude from foreign market value sales alleged to be below cost of production. *Fujitsu's Brief In Opposition To Certain Results of Redetermination Pursuant To Court Remand And In Support Of Arguments Covering Other Issues Before The Court* ("*Plaintiff's Memorandum In Opposition*"), at 2. That issue is addressed herein.

Also addressed herein are the following four issues which were raised in *Plaintiff's Memorandum*, for which proceedings have been suspended pursuant to the Court's May 12, 1993 remand order, pending the results of the remand. These issues are: (1) Commerce's decision to use constructed value in lieu of third country sales (*Plaintiff's Memorandum*, at 47–51); (2) Commerce's decision to adjust exporter's sales price downward for direct selling expenses (*Plaintiff's Memorandum*, at 60–63); (3) Commerce's calculation of the imputed interest adjustment to exporter's sales price (*Plaintiff's Memorandum*, at 66–72); (4) Commerce's refusal to adjust for differences between the level of trade of U.S.

purchase price sales and home market sales (*Plaintiff's Memorandum*, at 72–77).

## Standard of Review

In reviewing injury, antidumping, and countervailing duty investigations and determinations, this Court must hold unlawful any determination unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (*quoting Consolidated Edison Co. v. Labor Board,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Substantial evidence supporting an agency determination must be based on the whole record. *See Universal Camera Corp.,* 340 U.S. at 488, 71 S.Ct. at 464. The "whole record" means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion. *Id.* In other words, it is not enough that the evidence supporting the agency decision is "substantial" when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. *Id.* at 478, 488, 71 S.Ct. at 459, 464.

The interpretation of the laws administered by Commerce should be sustained if that interpretation is reasonable. *United States v. Zenith Radio Corp.,* 562 F.2d 1209 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978); *American Lamb Company v. United States,* 785 F.2d 994 (Fed.Cir. 1986). Furthermore, this Court should not reject the interpretation of a statute or regulation administered by an agency unless it has compelling reasons to do so. *Wilson v. Turnage,* 791 F.2d 151, 155–56 (Fed.Cir. 1986), *cert. denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986).

The Supreme Court has held, with regard to judicial review of an agency's construction of a statute it administers, that absent direct Congressional instruction as to the precise question at issue, the question for the Court to decide is whether the agency's interpretation is based upon a permissible construction of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Where the agency's interpretation of a statute represented a reasonable accommodation of manifestly competing interests, it was entitled to deference. *Id.* at 865, 104 S.Ct. at 2792. Since Commerce administers the trade laws and its implementing regulations, it is entitled to deference in its reasonable interpretations of those laws and regulations. *PPG Industries, Inc. v. United States,* 13 CIT 297, 299, 712 F.Supp. 195, 198 (1989), *aff'd,* 978 F.2d 1232 (Fed.Cir.1992). This should not suggest the vacation of meaningful judicial review, but rather a recognition that administrative agencies must be permitted to effectively employ their administrative expertise in carrying out their legislative mandates. *Id.*

## Discussion [1]

**A. Commerce's Determination To Exclude Below Cost Sales From Its Calculation Of Foreign Market Value**

19 U.S.C. § 1677b(b) provides in pertinent part:

**(b) Sales at less than cost of production**

Whenever [Commerce] has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If [Commerce] determines that sales made at less than cost of production—

(1) have been made over an extended period of time and in substantial quantities, and

---

1. The administrative record filed with the Court is contained on microfilm. Documents are identified by their respective Reel and Frame numbers: "C.R. Reel __, Frame __" for proprietary documents and "P.R. Reel __, Frame __" for public documents.

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade, such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value under subsection (a) of this section, [Commerce] shall employ the constructed value of the merchandise to determine its foreign market value.

19 U.S.C. § 1677b(b).

In the underlying administrative proceeding, Commerce conducted an investigation of whether Fujitsu's home market sales were at prices that were below the cost of production ("COP"). With respect to models VA–191.S, VA–53.R, and 19V–S1.B, Commerce excluded from foreign market value ("FMV") those sales which it found to be below COP. Pursuant to Commerce's "10/90/10 test," [2] all sales of model V–45.S (including those sales found to have been at prices above COP) were excluded from FMV and Commerce resorted to constructed value ("CV") as FMV, as more than 90 percent of sales of this model were found to be at prices below COP. C.R. Reel 10, p. 676 of computer printout.

In *Plaintiff's Memorandum*, Fujitsu contends that Commerce failed to make the prerequisite finding that such sales were made "over an extended period of time and in substantial quantities" as required by the statute. 19 U.S.C. § 1677b(b)(1). In particular, Fujitsu argues that, in view of its declining production costs, Commerce's use of annual weighted-average COPs for the various models, rather than monthly or quarterly weighted-averages, improperly skewed the analysis which led Commerce to the erroneous conclusion that prices were actually below COP over an extended period of time. *Plaintiff's Memorandum*, at 39–46. Pursuant to the parties' consent motion and this Court's May 12, 1993 Order, this case was remanded to Commerce, in part, for the purpose of revisiting the determinations with respect to below-cost sales of the four models at issue.

In the *Remand Determination*, Commerce concluded that its use of annual weighted-average COPs was justified as a reasonable and accurate measure of Fujitsu's production costs during the period and did not distort the analysis. *Remand Determination*, at 8. Commerce claimed that Fujitsu's production costs tended to fluctuate on a monthly basis, increasing in some months and decreasing in others, necessitating use of annual weighted-average COPs to adjust for such fluctuations. *Id.* at 6. In addition, Commerce maintained that its use of annual weighted-average COPs was reasonable because they reflected Fujitsu's preponderant production costs. Commerce contended that the difference between Fujitsu's costs at the beginning and end of the review period was not significant, and the quantity produced at lower costs was "significantly less" than that produced at higher costs. *Id.* at 6–7. Lastly, Commerce asserted that there was no evidence that Fujitsu's cost structure was affected by any extenuating circumstances warranting use of quarterly or monthly weighted-average COPs. *Id.* at 7–8.

In *Plaintiff's Memorandum In Opposition*, Fujitsu argues that Commerce's claim that its cost "fluctuated" is misleading and incorrect. Fujitsu points out that while Commerce's calculations in Attachment 2 of its March 28, 1994 *Remand Determination Analysis Memorandum* ("*March Memo*")[3]

---

**2.** Under Commerce's "10/90/10 test," if less than 10 percent by quantity of a model is sold at prices below COP, Commerce does not disregard any sales; if more than 90 percent of a model is sold at prices below COP, Commerce disregards all sales of that model and uses constructed value as the basis for determining FMV; if between 10 and 90 percent of the quantity of a model is sold at prices below COP, Commerce disregards the below cost sales and *only uses above COP sales.*

*E.g., Polyethylene Terephthalate Film, Sheet and Strip From Korea*, 56 Fed.Reg. 16,305 (April 22, 1991) (Final Determination Of Sales At Less Than Fair Value, "Foreign Market Value Section").

**3.** *See* Supplemental Administrative Record filed by Commerce on April 5, 1994. The schedules contained in Attachment 2 are located in the

indicate that an increase in its COP for models VA–53.R, VA–45.S and 19V–S1.B occurred in October 1986 (due to increased labor costs),[4] it is notable that this increase in COP followed seven months of steadily declining costs dating from the beginning of the review period.[5] *Plaintiff's Memorandum In Opposition*, at 6. Furthermore, Fujitsu argues that Attachment 2 of the *March Memo* also indicates, that the COP again steadily declined for the remainder of the review period after October 1986. Similarly, costs associated with model VA–191.S declined in each of the months of the review period that it was in production. *Id.*; C.R. Reel 3, Frame 3285.

Fujitsu argues that Commerce's claim that the quantity of merchandise produced at lower costs was "significantly less" than the quantity produced at higher costs is also patently mistaken. Fujitsu asserts that an examination of Commerce's calculations in Attachment 2 of the *March Memo* reveals that, to the contrary, very significant quantities, if not the majority, of the models were produced at the lower monthly COPs. As a consequence, Commerce's conclusion that the quantity produced at the lower production costs was relatively small and, hence, unrepresentative of Fujitsu's costs during the period, is completely unfounded. *Plaintiff's Memorandum In Opposition*, at 7–8.

In addition, Fujitsu argues that Commerce's attempt to minimize the rate of decline of its costs is flawed. Commerce's statement in the *March Memo*, at page 4, which states that the majority of the decline in costs occurred between March 1986 and April 1986 with only a 1 percent decline thereafter, reflects a distortion and misread-

ing on Commerce's part of Attachment 3 of the *March Memo*, on which Commerce's conclusion is based. *Id.* at 8. Fujitsu contends that for models V–45.S and VA–53.R, Commerce's calculations in Attachment 3 compare (1) the overall decline in costs over the entire period with (2) the difference in the average decline between the period April 1986 through September 1986 and the period October 1986 through February 1987. Fujitsu argues that Commerce's conclusion that the majority of the costs decline occurred in the first two months of the period simply does not follow from this analysis. By erroneously minimizing the cost declines occurring after April 1986, Commerce ignored the fact that Attachment 3 shows that the majority of the decline in costs in fact covers seven months, the majority of the review period. *Id.*

Moreover, Fujitsu argues that Commerce's use of annual weighted-average COPs has skewed the "sales below cost" test. *Id.* at 8–9. Fujitsu asserts that of all the models for which Commerce excluded sales from FMV, perhaps model V–45.S is most pertinent as Commerce excluded all sales of this model, because it found that over 90 percent of sales of this model were at prices below COP. Significantly, even under Commerce's analysis, Fujitsu contends that this harsh result would not have occurred had the volume of above-cost sales of this model increased by a mere 1.2627 percent, at which point the 10 percent threshold for above-cost sales would be achieved. Were Commerce to substitute the monthly COP figures from Attachment 2 in the *March Memo* for the annual weighted-average COP, different results would have been obtained. Above-cost sales of model V–

---

microfilm record at C.R. Reel 3, Frames 3283–3286.

**4.** Fujitsu claims that the rise in labor costs which resulted in the October 1986 cost increase was a one-time phenomenon reflecting start-up inefficiencies from the initiation of production at a new facility. Specifically, on April 1, 1986 Shinjo General Co., which theretofore had been a subsidiary of Fujitsu which acted as an assembly subcontractor for the merchandise at issue, was incorporated into Fujitsu. *See* P.R. Reel 1, Frame 2071 (Commerce COP and CV verification report dated April 5, 1990). *See also* C.R. Reel 3, Frame 3392 (April 12, 1988 submission).

To resolve a labor surplus at another Fujitsu factory, the Ichinoseki factory, certain production of the instant merchandise was begun at Ichinoseki at the time period in question. *See* C.R. Reel 3, Frame 5998 (Exhibit D–2–2(1) of December 1, 1989 submission). Due to start-up inefficiencies, labor costs increased. *Plaintiff's Memorandum In Opposition*, at 6–7.

**5.** Fujitsu argues that Commerce's calculation in the *March Memo*, Attachment 2, of the COP for model VA–53.R for September 1986 is in error. Fujitsu asserts that the COP for that month should be 28,210 yen, not 30,226 yen. *Plaintiff's Memorandum In Opposition*, at 6 n. 5.

45.S would likely have exceeded the required 10 percent threshold so that Commerce would not have excluded above-cost sales of this model. *Id.*

Fujitsu contends that the legislative history of the "sales at less than cost of production" provision makes clear that it is not only below-cost sales of "obsolete" merchandise that should not be disregarded, but also below-cost sales of "end-of-year" merchandise. S.Rep. No. 1298, 93d Cong., 2d Sess. 193 (1974) *reprinted in* 1974 *U.S.Code Cong. & Admin.News* 7186, 7310. Fujitsu asserts that Model VA–191.S was in a close-out situation even during the months preceding July 1986, as evidenced by the fact that production came to a crawl during those months,[6] as did sales.[7] As a consequence, Fujitsu argues that even if model VA–191.S was not technically "obsolete" prior to July 1986, it certainly is analogous to "end-of-year" merchandise which should not be excluded from FMV. In fact, it was actually "end-of-model" merchandise. *Plaintiff's Memorandum In Opposition,* at 11. Furthermore, Fujitsu argues that Commerce's conclusion that this model became "obsolete" for purposes of the legislative history only when production absolutely came to an end in July 1986 is itself erroneous. Such a standard is inconsistent both with business realities, which often require a winding-down period, and the clear intent of Congress which expressly sought to conform Commerce treatment of below-cost sales with normal business practice. *Id.* at 11–12.

Lastly, Fujitsu contests Commerce's decision to exclude below-cost sales of model 19V–S1.B as being unfounded, because Commerce failed to take into account start-up costs, including procurement and engineering costs, incurred in this model. *Id.* at 12. Fujitsu asserts that procurement and engi-

neering costs were reported for each model for subperiods correlating to its fiscal year. C.R. Reel 3, Frame 3664[8]; C.R. Reel 3, Frame 3711 ("Factory Overhead" column). Fujitsu concedes that while it is correct that these reported figures were arrived at through an allocation method,[9] it is nevertheless clear from information of record that sharp procurement and engineering cost increases took place during the first few months corresponding to the commencement of production of model 19V–S1.B, declining later in the period in January and February 1987. C.R. Reel 4, Frame 5996 (Exhibit D–1–5 of December 1, 1989 submission).[10] Fujitsu argues that Commerce's failure to investigate whether it sold model 19V–S1.B at below COP due to high start-up costs, and its failure to collect additional information from it during the underlying review or the long pendency of this remand should not redound to its detriment. *Plaintiff's Memorandum In Opposition,* at 12–13.

Commerce contends that Fujitsu's arguments are without merit. Commerce argues that Fujitsu neglects to point out that Commerce was obligated to calculate aggregate figures in the first place because Fujitsu did not provide complete monthly costs. However, Commerce does indicate that Fujitsu did supply its cost for March, 1986.[11] Commerce argues that its conclusion that the majority of the decline in costs appears to have occurred at the very beginning of the review period is reasonably based upon a comparison of the one-month amount Fujitsu reported for March, 1986, with the two reported aggregate amounts representing the remainder of the review period. *Defendant's Memorandum In Opposition,* at 18; *see* Attachment 3 to *March Memo.* Furthermore, Commerce argues that if Fujitsu's monthly

---

**6.** C.R. Reel 4, Frame 5998 (Exhibit D–2–2(1) of December 1, 1989 submission).

**7.** C.R. Reel 2, Frame 24 (Domestic Sales Quantity Exhibit of July 8, 1987 submission).

**8.** Procurement and engineering costs comprised the "Indirect Cost" column. C.R. Reel 3, Frame 3693.

**9.** C.R. Reel 3, Frames 3692–93.

**10.** Production of model 19V–S1.B commenced in August 1986. C.R. Reel 3, Frame 5998.

**11.** Fujitsu provides three cost calculations for each model. The first covers the first month of the review period. The second covers the next six months of the review period. The third cost calculation covers the remainder of the review period. *Plaintiff Memorandum In Opposition,* at 8; *see* Attachment 3 to *March Memo.*

costs had demonstrated a sustained decrease, Fujitsu would have submitted these costs on a monthly basis. Commerce cannot be blamed for alleged "distortions," where the alleged "flaw" was compelled by Fujitsu's own data. *Id.* at 19.

As to Fujitsu's argument that Commerce's calculations contradict Commerce's conclusions that the quantities produced at lower costs was "relatively small," Commerce argues that Fujitsu's argument is not supported by the record. Commerce notes that[ ]

Confidential Version of *Defendant's Memorandum In Opposition,* at 19–20; *March Memo,* at 4 and Attachment 4.

Commerce argues that Fujitsu's argument that the increase labor costs was a one-time phenomenon reflecting start-up "inefficiencies" resulting from the initiation of production at a new facility is unfounded. Commerce argues that Fujitsu does not adduce any record evidence establishing the existence of these alleged "inefficiencies." Nor does Fujitsu explain how it later resolved these "inefficiencies" to reduce its costs. Furthermore, Commerce argues that Fujitsu must have been aware that its claim of decreasing COPs would be severely undermined by the fact that its "labor costs for the four home market models whose below-cost sales [Commerce] excluded from its analysis increased faster than component costs decreased." *March Memo,* at 4 (*citing* Attachment 5). Yet, Fujitsu did not submit evidence to explain the increase in its labor costs or, establish that its COPs would nevertheless decrease. *Defendant's Memorandum In Opposition,* at 20–21.

Commerce argues that Fujitsu does not provide any evidence, conduct any analysis, or provide any specific examples to demonstrate that Commerce's annual weight-averaged COP methodology would produce distorted results. Commerce argues that this case simply does not involve significant fluctuations in raw material prices or other cost components that would cause an annual weight-averaged COP to be inaccurate. *Remand Determination,* at 5; *Defendant's Memorandum In Opposition,* at 22. To the contrary, Commerce argues that the fluctua-

tions that Fujitsu experienced are entirely normal:

> [T]he monthly data for cost of manufacturing ("COM") that Fujitsu submitted in its January 15, 1988 questionnaire response reveals that, on a monthly basis, Fujitsu experienced the type of fluctuations in COM that typically occur during a one-year accounting period; in certain months, Fujitsu's COM declined, while in other months, Fujitsu's COM increased.

*March Memo,* at 3 (*citing* Attachment 2).

Finally, Commerce argues that Fujitsu's claim that Commerce was not justified in disregarding Fujitsu's below-cost sales because the sales at issue involved discontinued merchandise or were "below-cost" only because of high "start-up" costs is without merit and does not comport with the policy identified in the legislative history upon which Fujitsu relies. *Defendant's Memorandum In Opposition,* at 24; *see* S.Rep. No. 1298, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.A.N. 7186, 7319.

■ Commerce argues that the policy at issue is to accord Commerce the discretion to use below-cost sales made pursuant to "normal business practice." *Id.* In the case at hand, Fujitsu made substantial quantities of below-cost sales of model VA–191.S during the five months preceding the cessation of production. *See March Memo,* Attachment 6. Fujitsu's claim that these sales represent the liquidation of existing stocks pursuant to "normal business practice" is simply not credible. *Remand Determination,* at 10. Nor does the quantity of these sales suggest a "winding-down period." *Defendant's Memorandum In Opposition,* at 24–25.

As to Fujitsu's argument that Commerce erred in excluding below-cost sales of model 19V–S1.B because a significant component of its COP were start up costs, including procurement and engineering costs, Commerce concludes that Fujitsu's arguments are not supported by substantial evidence. Commerce argues that Fujitsu did not report model-specific data for procurement and engineering costs. In the absence of such model specific data, there is plainly no way to determine what portion of these procurement

and engineering costs represented start-up costs contributed by model 19V–S1.B. *Remand Determination*, at 10. It is not Commerce's duty to investigate the extent to which Fujitsu's below-cost sales were due to start-up costs. *Defendant's Memorandum In Opposition*, at 25.

■ Fujitsu has produced no persuasive evidence to substantiate its claims that its COPs were declining at a significant rate. This is especially troublesome, in light of the fact that evidence on the record indicated rising labor costs. *Remand Determination*, at 11. As Commerce pointed out, these random fluctuations in COP that Fujitsu has identified are precisely the type of routine, random variations that justify Commerce's preference of using annual weighted-average COP. *Id.* at 6. Because this preferred methodology has a reasonable basis, it is entitled to deference. *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed.Cir.1992). Moreover, as explained by Commerce, the use of a monthly or quarterly weighted-average COPs would understate Fujitsu's actual COPs because the quantities produced at lower cost were significantly smaller than the quantities produced at higher cost. Lastly, Fujitsu's arguments that its below-cost sales were condonable as sales of obsolescent merchandise or in the alternative justified by start-up costs are not supported by evidence on the record.

After reviewing the remand results and the briefs submitted by the parties regarding such results, the Court concludes that there exists substantial evidence on the record to support Commerce's determination. Accordingly, Commerce's remand determination is sustained.

B. *Commerce's Decision To Use Constructed Value In Lieu Of Third Country Sales As Foreign Market Value*

Fujitsu argues that Commerce erred in basing FMV upon CV where there were insufficient above-cost home market sales. Instead, Fujitsu argues that Commerce was obligated to base its calculation of FMV upon third-country sales. *Plaintiff's Memorandum In Opposition*, at 14–19.

Fujitsu argues that this case is governed by 19 U.S.C. § 1677b(a)(1). Section 1677b(a)(1) provides in relevant part:

**§ 1677b. Foreign market value**

**(a) Determination; fictitious market, sales agencies**

For purposes of this subtitle—

**(1) In general**

The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person who is not described in subsection (e)(3) of this section with respect to such person—

(A) at which such or similar merchandise is sold, or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption, or

(B) if not so sold or offered for sale for home consumption, *or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an adequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States,*

\* \* \*

19 U.S.C. § 1677b(a)(1) (emphasis added). Fujitsu argues that the legislative history of the Trade Agreements Act of 1979 specifically states that "third country prices will normally be preferred over constructed value if presented in a timely manner and if adequate to establish foreign market value." S.Rep. No. 249, 96th Cong. 1st Sess. 96, *reprinted in* 1979 *U.S.Code Cong. & Ad.News* 381, 482.

Fujitsu argues that nowhere has Commerce made any finding which shows that third country prices would have been inadequate. *Plaintiff's Memorandum In Opposition*, at 18. In support of its argument, Fujitsu cites to *Floral Trade Council of Davis, California v. United States*, 15 CIT

497, 498–500, 775 F.Supp. 1492, 1496–98 (1991) where Commerce disregarded third country sales in favor of CV only under "extraordinary circumstances," based upon specific findings that evidence on the record indicates that third country sales prices are an inappropriate basis for comparison.

Commerce argues that Fujitsu is mistaken as to the proper provision which governs the issue at hand. Commerce argues that 19 U.S.C. § 1677b(b), *supra,* specifically directs the use of CV under the circumstances of this case. *Defendant's Memorandum In Response To Plaintiff's Comments Upon The Results Of The Remand Determination And In Opposition to Plaintiff's Motion For Judgment Upon the Agency Record ("Defendant's Memorandum In Opposition"),* at 26. Commerce argues that it was unable to determine FMV using Fujitsu's home market sales for the sole reason that, after below-cost sales were disregarded, insufficient sales remain. Under these circumstances, the directive of the statute is unambiguous and Commerce has no discretion to use third-party sales. *Id.* at 26–27; *see e.g. Certain Fresh Cut Flowers from Mexico: Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 19,597 (May 7, 1992) (for producers whose home market sales were below their COP, Commerce based FMV upon CV).

Commerce argues that 19 U.S.C. § 1677b(a)(1) only applies when "the quantity [of merchandise] sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an adequate basis for comparison." In this case, the quantity of television receivers "sold for home consumption" presented no obstacle to a comparison between sales in the home and United States market, Commerce had determined that Fujitsu's home market was "viable." *Television Receivers, Monochrome and Color, From Japan; Preliminary Results of Antidumping Duty Administrative Review ("Preliminary Results"),* 55 Fed.Reg. 42,616, 42,617 (October 22, 1990). Instead, Commerce's inability to use home market sales to calculate FMV was the result of a completely different problem—*i.e.,* Fujitsu's numerous below-cost

sales. *Defendant's Memorandum In Opposition,* at 27.

Commerce argues that use of third country sales is only authorized under circumstances in which the home market is not "viable." 19 U.S.C. § 1677b(a)(1)(B). Because Commerce concluded that Fujitsu's home market was "viable," Commerce had no discretion to use third country sales. *Id.* at 28; *see, e.g., Fresh Chilled Atlantic Salmon from Norway: Final Determination of Sales at Less Than Fair Value,* 56 Fed.Reg. 7661, 7662 (February 25, 1991) (analyzing third country sales for all respondents except respondent with "viable" home market).

Furthermore, Commerce argues that Fujitsu's reliance upon *Floral Trade Council of Davis, California, supra,* is misplaced. In that case, Commerce determined in the underlying administrative determination that none of the companies subject to review had sufficient home market sales. *Certain Fresh Cut Flowers From Columbia: Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 20,491, 20,492 (May 17, 1990). By contrast, Fujitsu did have sufficient quantities of home market sales to provide a comparison to its U.S. sales. *Preliminary Results,* 55 Fed.Reg. at 42,617.

■ Based on the pertinent facts and the applicable provisions of the statute, there is an adequate factual basis to support Commerce's determination as reasonable and in accordance with law. 19 U.S.C. § 1677b(b) mandates the use of CV when Commerce is unable to determine FMV of respondent's home market sales due to below-cost sales. By comparison, 19 U.S.C. § 1677b(a)(1) mandates that sales to third countries are intended to be utilized in computing dumping margins only as a secondary or residual basis of comparison when the *quantity of merchandise* sold in the country of exportation is nonexistent or so small as to be an adequate basis of comparison. In this case, Commerce determined that the quantity of subject merchandise sold for home consumption presented no problem, rather, Commerce's inability to use home market sales to calculate FMV was the direct result of Fujitsu's below-cost sales. Accordingly, Commerce's determination to use CV is sustained.

**C. Commerce's Method Of Calculating The Imputed Interest Adjustment To The Exporter's Sales Price**

Fujitsu argues that Commerce imputed interest in an improper manner by which it was doubly penalized for not being able to sell certain inventoried televisions fast enough or at a high enough price. Wherefore, for older merchandise the imputed interest expense far exceeded the way Fujitsu and its subsidiary, Teknika Electronics Corporation ("Teknika") (the U.S. importer), actually accounted for expenses of maintaining older inventory. *Plaintiff's Memorandum In Opposition*, at 22.

Fujitsu contends that the imputed interest adjustment is not based on an actual expense incurred by it or Teknika. Rather, it is a fictional expense imputed to U.S. sales by Commerce. The adjustment is based on Commerce's assumption that the respondent incurs a cost when it purchases merchandise and then holds it in inventory. *Id.* at 23. The adjustment amount was determined by Commerce based on three factors: (1) amount of time in inventory, *i.e.*, the actual number of days from entry until date of sale; (2) the unit transfer price; and (3) Teknika's short-term interest rate. Fujitsu objects to the use of a date-of-entry to date-of-sale inventory period for every transaction. Rather, median length of time in U.S. inventory should have been used to avoid distortions caused by Teknika's inability to sell Fujitsu's televisions. *Id.* at 23–24.

Fujitsu argues that the use of actual inventory periods to calculate a theoretical, as opposed to an actual expense is unreasonable and contrary to accepted business and accounting principles. Further, Fujitsu argues that a respondent should not be penalized with antidumping duty margins due to factors which it cannot control. To support its position, Fujitsu cites to *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984), in which the court stated,

The purpose of the antidumping law, as its name implies, is to discourage the practice of selling in the United States at LTFV by the imposition of appropriately increased duties. That purpose would be ill-served by application of a mechanical formula to find LTFV sales, and thus a violation of the antidumping laws, where none existed. A finding of LTFV sales based on a margin resulting solely from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair.

*Melamine Chemicals, Inc.*, 732 F.2d at 933.

Commerce argues that it imputes an interest expense for time in inventory in order to adjust for the "missed opportunity" costs of maintaining merchandise in inventory. *Defendant's Memorandum In Opposition*, at 28. As Commerce explained in *Television Receivers, Monochrome and Color, from Japan: Final Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 38,417 (August 1991),

[a]n opportunity cost arises because funds expended therefor could have been invested in alternative financial arrangements yielding interest during the inventory period. Since the interest expense associated with time in inventory cannot be isolated from other interest expenses, [Commerce] must impute this expense amount. However, [Commerce's] long-standing policy is to treat the opportunity cost as a real expense.

*See also Color Television Receivers, Except for Video Monitors, from Taiwan Final Results of Antidumping Duty Administrative Review*, 56 Fed.Reg. 65,218 (December 16, 1991); *Portable Electric Typewriters from Japan: Final Results of Antidumping Duty Administrative Review*, 52 Fed.Reg. 1,504 (January 14, 1987).

Commerce argues that Fujitsu's contentions are flatly inconsistent with the purpose of Commerce's determination of imputed interest, which is to make the most accurate estimate possible of the real expense incurred by Fujitsu. Regardless of Fujitsu's intentions, the magnitude of this expense is directly dependent upon the length of time that its merchandise remains in inventory. *Defendant's Memorandum In Opposition*, at 29. Commerce argues that Fujitsu is also wrong in contending that use of actual inventory data departs from commercial realities. Commerce asserts that Fujitsu apparently bases this contention upon its assumption

that a company is entitled to engage in various flights of accounting legerdemain in order to mitigate the results that would otherwise be obtained through the use of actual costs. *Id.* at 29–30. Commerce argues that this ease of manipulation is precisely why it uses actual cost wherever possible. As Commerce explained,

> Whenever possible, we prefer using data for individual transactions rather than weight-averaged data because this [individual transaction data] more accurately reflects actual costs. Since [Fujitsu] was able to provide the actual inventory period for each individual transaction, we used those data to determine [Fujitsu]'s U.S. inventory carrying cost.

*Final Results,* 56 Fed.Reg. at 5,395. In any event, Commerce argues that Fujitsu's imputed interest expense was calculated in exactly the same manner as in prior administrative reviews. *See, e.g., Television Receivers, Monochrome and Color, from Japan: Final Results of Antidumping Duty Administrative Review,* 53 Fed.Reg. 4050, 4054 (February 11, 1988) (Comment 39).

■ The Court finds that Commerce's use of actual inventory periods to calculate the imputed interest expense was reasonable and in accordance with law. The use of actual transaction specific data would result in the most accurate calculation of the imputed interest adjustment. Accordingly, Commerce's determination is sustained.

### D. *Commerce's Downward Adjustment For Direct Selling Expenses To Exporter's Sales Price*

Fujitsu argues that Commerce's adjustment of direct selling expenses to exporter's sales price ("ESP") is impermissible as direct selling expenses may only be adjusted to FMV as "differences in circumstances of sale" pursuant to 19 U.S.C. § 1677b(a)(4)(B). *Plaintiff's Memorandum In Opposition,* at 19–21. Fujitsu argues that a long line of decisions issued by this Court unequivocally indicates that Commerce is wrong and that direct selling expenses must instead be adjusted for by way of an upward adjustment to FMV.[12] *See Plaintiff's Memorandum In Opposition,* at 19–20; *Plaintiff's Memorandum In Reply To Defendant's Memorandum In Response To Plaintiff's Comments Upon The Results Of The Remand Determination And In Opposition To Plaintiff's Motion for Judgment Upon The Agency Record ("Plaintiff's Reply Memorandum"),* at 32–33.

Commerce argues that in accordance with its long-standing administrative practice, it deducted direct selling expenses from ESP pursuant to 19 U.S.C. § 1677a(e)(2) notwithstanding this Court's decision in *NTN Bearing Corp. of America v. United States,* Slip Op. 93–56 at 4, 1993 WL 129799 (April 21, 1993), that no such adjustment is authorized. Commerce points out that this issue is now on appeal to the Federal Circuit. *See, e.g., Koyo Seiko Co., Ltd. v. United States,* 810 F.Supp. 1287 (1993), *appeal docketed,* No. 93–1534.

Commerce argues that 19 U.S.C. § 1677a(e)(2) specifically requires it to reduce ESP by "expenses generally incurred by or for the account of the exporter in selling identical or substantially identical merchandise." Commerce argues that it has interpreted the words "expenses generally incurred by ... the exporter in the United States....," as covering direct and indirect selling expenses related to United States sales. Commerce argues that this Court has sustained that interpretation as reasonable in the context of deciding that it correctly deducted from ESP imputed United States credit expenses in *Silver Reed America Inc. v. United States,* 12 CIT 39, 42–45, 679

---

12. *See e.g., RHP Bearings v. United States,* 17 CIT ——, 833 F.Supp. 933, 935 (1993); *NSK Ltd. v. United States,* 1993 WL 405406 (1993); *NSK Corp. v. United States,* 17 CIT ——, Slip Op. 93–92 at 3, 1993 WL 193225 (June 3, 1993); *NTN Bearing Corp. of America v. United States,* 1993 WL 129799 (April 21, 1993); *NTN Bearing Corp. of America v. United States,* 1993 WL 118051 (April 13, 1993); *NSK Ltd. v. United States,* 17

CIT ——, 819 F.Supp. 1096, 1099 (1993), *mot. denied, dismissed,* 17 CIT ——, 825 F.Supp. 315 (1993); *Koyo Seiko Company Ltd. v. United States,* 16 CIT 539, 544, 796 F.Supp. 1526, 1531 (1992); *NTN Bearing Corp. of America v. United States,* 14 CIT 623, 637, 747 F.Supp. 726, 738–39 (1990); *Timken Co. v. United States,* 11 CIT 786, 800, 673 F.Supp. 495, 512 (1987).

F.Supp. 12, 15–17 (1988), *aff'd, reversed, and remanded (on other grounds),* 12 CIT 250, 252–55, 683 F.Supp. 1393, 1396–97 (1988). *Defendant's Memorandum In Opposition,* at 33–34.

■ In a recent Federal Circuit decision, the court addressed the precise issue at hand. In *Koyo Seiko Co., Ltd., et al. v. United States,* 36 F.3d 1565 (1994), the court held that Commerce, in calculating dumping margin, properly deducted direct selling expenses incurred on United States sales of the subject merchandise from the ESP, rather than adding such expenses to FMV as a "circumstance of sale" adjustment. The court stated that nothing in the plain language or the legislative history of the Antidumping Act precludes Commerce's methodology of adjusting ESP by deducting therefrom direct selling expenses incurred in the United States. The court remanded the case for recalculation of ESP and FMV in a manner consistent with its decision.

Based on the recent *Koyo Seiko Co., Ltd., et al.* decision, this Court adheres to Commerce's practice of applying a deduction for direct selling expenses to ESP. Accordingly, Commerce's deduction of Fujitsu's direct selling expenses from ESP is reasonable and in accordance with law.

### E. *Commerce's Refusal To Make A Level Of Trade Adjustment*

Fujitsu argues that Commerce's refusal to adjust for differences in the level of trade between its purchase price sales to U.S. distributors and home market sales to retailers is unsupported by substantial evidence on the record and is not otherwise in accordance with law. *Plaintiff's Memorandum In Opposition,* at 29–34; *Plaintiff's Reply Memorandum,* at 27–32.

Fujitsu argues that it clearly indicated in its questionnaire response that it sold directly to the retail trade in the home market and to the wholesale trade in the United States, even using the signal words "course of trade." *Plaintiff's Reply Memorandum,* at 28; C.R. Reel 2, Frames 1055–56 (Questionnaire Responses of December 9, 1987). As a consequence, Fujitsu argues that Commerce was alerted to the differing levels of trade from the very outset of the administrative review. Fujitsu argues that while it may not have included all necessary data on the level of trade issue in its questionnaire response, it provided such information to Commerce soon after, which Commerce verified in February 1988, over two-and-a-half years before the preliminary brief date. *Plaintiff's Memorandum In Opposition,* at 32.

Furthermore, Fujitsu argues that even though it may not have formally stated that it was "claiming" a level of trade adjustment in its questionnaire response does not mean that it's level of trade claim is untimely. In fact, Commerce points to no section of the statute or regulations which supports its implied assertion that there was a particular deadline which it missed. *Id.* at 28–29. Fujitsu argues that there is no justifiable reason to distinguish this case from other cases in which Commerce has granted a level of trade adjustment based on direct selling expenses incurred in the home market. *Id.* at 33; *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, et al.: Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 28,360 (June 24, 1992); *Television Receivers, Monochrome and Color, from Japan: Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 35,916, 35,921 (September 4, 1990).

Commerce asserts, and Fujitsu concedes, that it was not until the hearing stage that Fujitsu first asserted a right to a "level of trade" adjustment. *Defendant's Memorandum In Opposition,* at 31; *Plaintiff's Memorandum In Opposition,* at 30. In the *Final Results,* Commerce rejected Fujitsu's claim, stating

> [d]espite the fact that our standard questionnaire specifically requests information on level-of-trade adjustments, Fujitsu only raised the issue of a level of trade adjustment for the first time in its prehearing brief. Accordingly, we consider Fujitsu's request for this adjustment to be untimely, and have not made such an adjustment.

*Final Results,* 56 Fed.Reg. at 5,395. Commerce argues that analysis of Fujitsu's questionnaire response confirms *that no level of*

*trade adjustment claim was made.* Moreover, Commerce points out that Fujitsu's questionnaire response *did claim* a quantity adjustment, and a circumstance of sale adjustment. *Defendant's Memorandum In Opposition,* at 31 n. 18.

Commerce argues that Fujitsu was required to establish its claim to the adjustment "to the satisfaction of the Secretary." 19 C.F.R. § 353.54. Commerce argues that it is plaintiff's burden to support its claim for a level of trade adjustment with evidence that: (1) Commerce, in fact, compared sales at different levels of trade; and (2) comparisons of sales at different levels of trade resulted in price differences. *NAR, S.p.A. v. United States,* 13 CIT 82, 84–85, 707 F.Supp. 553, 557 (1989); *Florex v. United States,* 705 F.Supp. 582, 590 (1989). In addition, the plaintiff must provide evidence justifying a proposed methodology that would allow Commerce to quantify the adjustment. *Silver Reed America, Inc. v. United States,* 13 CIT 286, 289, 711 F.Supp. 627, 630–31 (1989).

Lastly, Commerce argues that the cases cited by Fujitsu, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, et al.* and *Television Receivers, Monochrome and Color, from Japan* are distinguishable. The respondents in those cases presented timely level of trade claims, accompanied by evidence in support of those claims. *Defendant's Memorandum In Opposition,* at 33 n. 20.

In sum, Fujitsu failed to make a claim for a level of trade adjustment in its questionnaire response. Moreover, Fujitsu failed to provide all the necessary data in its questionnaire response for such an adjustment. It wasn't until the prehearing brief that Fujitsu first raised this claim to Commerce. In contrast, the Court notes that Fujitsu clearly articulated a claim for a quantity adjustment and circumstance of sale adjustment in it questionnaire response. Furthermore, Fujitsu failed to provide any method to measure or quantify the appropriate amount of level of trade adjustment or provide substantiating information necessary to implement those methods. It is Fujitsu who has the burden of supporting its claim for a level of trade adjustment and not Commerce. *See Florex*

*v. United States, supra.* Fujitsu has failed to meet that burden.

Accordingly, the Court agrees with Commerce's reasons for denying Fujitsu's claim for a level of trade adjustment, and therefore finds that Commerce properly exercised its discretion in rejecting Fujitsu's claim for a level of trade adjustment.

### Conclusion

For the foregoing reasons, the Court denies plaintiff's motion for judgment on the agency record and sustains the final results, as modified by the final results of redetermination pursuant to Court remand.

### JUDGMENT

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision therein; now, in conformity with that decision, it is hereby

**ORDERED** that plaintiff's motion for judgment upon the agency record is denied; and it is further

**ORDERED** that the *Final Results of Antidumping Duty Administrative Reviews,* 56 Fed.Reg. 5,392 (February 11, 1991), as modified by the *Final Results of Redetermination Pursuant to Court Remand* filed with the Court on March 28, 1994 is affirmed; and it is further

**ORDERED** that the action is dismissed.