**MAGYAR GORDULOCSAPAGY MUVEK, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**The Timken Company, Defendant–Intervenor.**

Slip Op. No. 95–119.
Court No. 93–10–00685.

United States Court of International Trade.

June 30, 1995.

Bryan, Cave, McPheeters & McRoberts, Washington, DC (Peter D. Ehrenhaft), for plaintiff.

Frank W. Hunger, Asst. Atty. Gen.; and David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice (A. David Lafer, Senior Trial Counsel); of counsel: Robert J. Heilferty and Boguslawa Thoemmes, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Stewart and Stewart, Washington, DC (Terence P. Stewart and Charles A. St. Charles), for defendant-intervenor.

### OPINION

TSOUCALAS, Judge:

Plaintiff, Magyar Gordulocsapagy Muvek ("MGM"), a Hungarian exporter/manufacturer of tapered roller bearings, moves pursuant to Rule 56.2 of the Rules of this Court, for an order remanding this matter to the Department of Commerce, International Trade Administration ("Commerce"), with instructions

to (1) recalculate the foreign market value of the merchandise subject to this administrative review; (2) accept as part of the administrative record, the supplemental information proffered by counsel for MGM concerning publicly available data on the value of Mexican imports of hot-rolled steel rods and to use such data in calculating the foreign market value of the subject merchandise; and (3) revise the dumping margins determined in its final determination in *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the Republic of Hungary; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 58 Fed.Reg. 47,861 (1993), in light of the information which plaintiff provided. The challenged determination covers the period of June 1, 1990 through May 31, 1991.

### BACKGROUND

On June 19, 1987, Commerce published an antidumping duty order covering tapered roller bearings ("TRBs") from the Republic of Hungary ("Hungary"), *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the Hungarian People's Republic (Hungary); Antidumping Duty Order*, 52 Fed.Reg. 23,319 (1987), following affirmative determinations by Commerce and the International Trade Commission, respectively, that the subject merchandise was being sold in the United States at less than fair value and was causing or was likely to cause material injury to a domestic industry.

Based upon MGM's request, Commerce initiated a fourth administrative review of the antidumping duty order covering the period 1990–1991. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 56 Fed.Reg. 40,305 (1991). MGM was the sole known exporter of TRBS from Hungary to the United States during the review period.

Briefly, since Hungary is a nonmarket economy country, Commerce utilized the factors of production methodology to determine foreign market value ("FMV") pursuant to 19 U.S.C. § 1677b (1988). Section 773(c) of the

Tariff Act of 1930, as amended, required that Commerce determine the FMV using the constructed value based upon the valuation of the factors of production or prices of such or similar merchandise sold in a comparable market economy country or countries. 19 U.S.C. § 1677b(c) (1988). MGM stated that it did "not contest the Department's recommendation that Hungary be treated as a nonmarket economy (NME) for purposes of this administrative review." P.R. Doc. No. 21.[1]

On December 30, 1991, Commerce's Office of Policy updated its analysis of market economy countries considered to be comparable to Hungary, based on evolving economic conditions within those countries. P.R. Doc. No. 13. This current analysis proposed South Africa, Uruguay, Algeria, Malaysia and Mexico as comparable surrogate countries for purposes of valuing the factors of production. The policy recommendation advised that

> if you do not have or cannot get production figures, you can use exports as a proxy.... Whenever possible, use publicly available factor price data, or data that can be made publicly available. If no useful factor price data is available from the five countries ..., you will have to resort to surrogate country export prices of comparable merchandise. Mexico and Malaysia maintain non-product-specific export subsidies, so export prices of those countries should not be used.

*Id.* In response to Commerce's request for comments concerning potential surrogate countries, MGM stated, by letter dated January 31, 1992, that "the use of either South Africa or Mexico would be most appropriate" as surrogate countries. P.R. Doc. No. 21.

On March 3, 1992, Commerce sent cables to the U.S. Embassies in South Africa, Algeria, Malaysia, Uruguay and Mexico requesting information for the valuation of the factors of production reported by MGM. P.R. Doc. Nos. 24–28. The embassies failed to provide surrogate country data from which Commerce could value the factors of production of TRBs.

---

1. Citations to documents contained in the public record of this administrative review are designat-

ed "P.R.".

On August 12, 1992, Commerce published the preliminary results of its review. *See Preliminary Results of Antidumping Duty Administrative Review: Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the Republic of Hungary* ("*Preliminary Results* "), 57 Fed.Reg. 36,068 (1992). Commerce noted that it had sent cables requesting documentation relating to the values for the factors of production to the American Embassies in each possible surrogate country. Commerce further noted that it chose Mexico as a surrogate for valuing the factors of production because Commerce was able to obtain more complete publicly available data pertaining to Mexico than for other potential surrogate countries with comparable economies which produced TRBs. *Preliminary Results*, 57 Fed.Reg. at 36,069. For the purposes of valuing certain raw material inputs (specifically, steel rods), Commerce relied upon publicly-available information from the National Trade Data Bank because data from local sources was not available. *Id.* This information, U.S. FAS (free alongside ship) export values for shipments of steel to Mexico, was concurrent with the period of review.

In its case brief dated September 14, 1992, MGM attempted to provide Commerce with new factual information concerning Mexican import values of hot-rolled steel rods. Commerce rejected the information as untimely and returned the case brief to MGM, along with an explanation detailing the reasons for the rejection.

On September 13, 1993, Commerce published its final results of administrative review, with a final dumping margin of 6.66 percent for exports by MGM. *Final Results*, 57 Fed.Reg. at 47,865.

MGM now brings this action, contending that Commerce erred in refusing to utilize the Mexican import data contained in its case brief for purposes of calculating foreign market value.

## DISCUSSION

■ This Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### Foreign Market Value Calculation

MGM argues that Commerce's rejection of its data proffered after the preliminary determination was issued, and Commerce's failure to obtain the very information MGM attempted to submit, were arbitrary, capricious and an abuse of discretion. *Motion of Plaintiff, Magyar Gordulocsapagy Muvek, for Judgment Upon Agency Record and Memorandum of Points and Authorities in Support* ("*Plaintiff's Brief*") at 21.

Plaintiff claims that the data which counsel for MGM attempted to submit into the administrative record on September 14, 1992, was (1) not information about or concerning MGM or its exports to the United States; (2) not data in respondent's own control which it had failed or refused to provide in a timely manner; and (3) not contradicting or enlarging data that MGM had already submitted. *Plaintiff's Brief* at 9–10. Rather, plaintiff claims that the data was publicly available information, from another country, compiled by another government, that would have aided Commerce's surrogate country analysis and thus would have resulted in a more realistic dumping determination. *Id.* at 10. Plaintiff contends that the submitted information was, in fact, the "best available information," for calculating FMV in a nonmarket economy case as required by 19 U.S.C. § 1677b(c)(1) (1988). *Id.*

Plaintiff also argues that in valuing steel inputs in the selected surrogate country,

Mexico, Commerce did not use data obtained from Mexico or in Mexico. Instead, Commerce used data of United States steel exports to Mexico, on an FAS basis, obtained from the National Trade Data Bank for 1990–1991 to value hot-rolled steel rods used by MGM to produce bearings. Plaintiff claims that this was contrary to the statutory requirement, contrary to Commerce's own regulations and a departure from Commerce's usual practice. *Plaintiff's Brief* at 12.

Commerce argues that the alleged new factual data MGM attempted to enter in the administrative record was contained in MGM's case brief dated September 14, 1992, while Commerce had issued its preliminary determination one month earlier on August 12, 1992. Commerce argues that, consequently, there can be no question that MGM's submission was untimely—a "fact" which is readily conceded by MGM. *Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record,* ("*Defendant's Brief*") at 7.

■ It is a well-settled principle of administrative law that an agency has broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 544–45, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978).

■ In conducting administrative reviews under Section 751(a) of the Tariff Act (19 U.S.C. § 1675(a) (1988)), Commerce requests pertinent information from those who will be affected by the results of the review. In order to comply with the requirements of the statute, Commerce provides participants a specified period within which the requested information may be provided. Commerce has promulgated a regulation which sets forth the time limits governing the submission of factual information. Commerce's regulation provides that information may be accepted until "the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review." 19

C.F.R. § 353.31(a)(1)(ii) (1991). The regulation establishing the deadline for the submission of factual information warns that:

> [Commerce] will not consider in the final determination or the final results, or retain in the record of the proceeding, any factual information submitted after the applicable time limit. [Commerce] will return such information to the submitter with written notice stating the reasons for the return of the information.

19 C.F.R. § 353.31(a)(3) (1991). Hence, after the time period expires, Commerce "must refuse to consider untimely submitted information and instead rely on the best information available." *Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 36, 628 F.Supp. 198, 204 (1986). MGM has provided no reasonable explanation for its delay in submitting the materials at issue, particularly since it concedes that the data was readily available. *Plaintiff's Brief* at 10, 13; *see also* P.R. Doc. No. 70 at 4.

■ It is clear from the administrative record before the Court that MGM attempted to provide Commerce with factual information concerning Mexican import data after the publication of the Preliminary Results of review and over 180 days from the publication of the initiation of the review. In general, this Court has upheld Commerce's rejection of untimely submitted factual information pursuant to 19 C.F.R. § 353.31(a). See *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 24, 704 F.Supp. 1114, 1124 (1989), *aff'd,* 901 F.2d 1089 (Fed.Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990); *Seattle Marine Fishing Supply Co. v. United States,* 12 CIT 60, 71, 679 F.Supp. 1119, 1128 (1988). The Court has also stated, however, that in cases where corrected information was untimely filed and rejected by Commerce, "if [an] error was so egregious and so obvious that the failure to correct it was an abuse of discretion and undermined the interest of justice, the Court may remand the case to [Commerce] for adjustment of the calculations." *Tehnoimportexport v. United States,* 15 CIT 250, 258–59, 766 F.Supp. 1169, 1178 (1991).

MGM argues that it "could, admittedly, have roamed the world in search of useful data to submit. Such efforts, however, would have been unduly costly and burdensome, especially in light of MGM's weak financial position, the relatively small number and value of the products it exported to the U.S. and the lack of contacts in any of the potential surrogate countries for gathering the necessary data." *Plaintiff's Brief* at 20. However, MGM itself refutes the position that finding pertinent data would have been costly or burdensome by referring to the "ready availability" of the data which it sought untimely to submit and, noting that, in response to its inquiries for pertinent data concerning Mexican imports of steel products, the Mexican government "promptly provided the requested data." *Id.* at 7. Instead of submitting this readily available and, allegedly, more accurate data, MGM chose to wait until after the requisite time period for providing information pertaining to the valuation of the factors of production. Commerce is not obliged by statute or regulation to invite such additions to the record. Opportunity was provided and extensions of time within which data could be submitted were granted the parties. *See* P.R. Doc. Nos. 9, 10, 13, 14, 15, 18, 20, 21, 34, 38, 39. *See also* P.R. Doc. No. 76.

■ Nothing in the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1303 et seq. (1988, Supp. I & Supp. II, 1990) or its legislative history mandates that Commerce must derive foreign market values exclusively from either actual prices paid by nonmarket economy or from surrogate-based values. Title 19, United States Code, Section 1677b(c)(1) (1988) provides simply that "valuation of the factors of production shall be based on the best available information" regarding values in a surrogate country. Additionally, Commerce shall only utilize "to the extent possible" the prices or costs in the surrogate country. 19 U.S.C. § 1677b(c)(4) (1988). *See Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT 931, 806 F.Supp. 1008 (1992). Therefore, the Court finds that the use of publicly available U.S. export data values for shipments of bearing quality steel to Mexico was in accordance with law and agency practice. Pursuant to statute, Com-

merce must value the factors of production "in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. § 1677b(c)(1). U.S. export values of steel sold to Mexico provide a reasonable basis for estimating the cost of that steel to a Mexican producer. The U.S. export data which Commerce used in this case was sourced from the National Trade Data Bank, consistent with Commerce's policy of valuing the factors of production with publicly available information. *See, e.g., Final Determination of Sales at Less Than Fair Value: Certain Carbon Steel Butt–Weld Pipe Fittings From the People's Republic of China,* 57 Fed.Reg. 21,058 (1992).

## CONCLUSION

The Court finds that Commerce's refusal to utilize the Mexican import data contained in MGM's case brief for purposes of calculating foreign market value is supported by substantial evidence and is otherwise in accordance with law. Accordingly, MGM's motion for judgment upon the administrative record is denied and Commerce's determination is sustained in all respects.

## JUDGMENT

This case having been duly submitted for decision following plaintiff's motion for judgment upon the agency record, and the Court, after due deliberation, having rendered a decision herein; now then, in accordance with said decision,

**IT IS HEREBY ORDERED** that plaintiff's motion for judgment upon the agency record is denied; and it is further

**ORDERED** that the determination of the Department of Commerce, International Trade Administration, is affirmed in all respects; and it is further