**FUJITSU GENERAL LIMITED,**
Plaintiff–Appellant,

v.

**The UNITED STATES, Defendant–Appellee.**

No. 95–1343.

United States Court of Appeals, Federal Circuit.

July 3, 1996.

Paul A. Horowitz, Siegel, Mandell & Davidson, P.C., New York City, argued for plaintiff-appellant. With him on the brief was Brian S. Goldstein.

Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued for defendant-appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel were Velta A. Melnbrencis, Department of Justice, and Robert J. Heilferty, Attorney–Advisor, Department of Commerce, Washington, D.C.

Before MICHEL and PLAGER, Circuit Judges, and SKELTON, Senior Circuit Judge.

MICHEL, Circuit Judge.

Fujitsu General Limited ("FGL") appeals the March 14, 1995 decision of the United States Court of International Trade, *Fujitsu General Ltd. v. United States*, 883 F.Supp. 728 (Ct. Int'l Trade 1995), sustaining certain determinations made by the International Trade Administration of the United States Department of Commerce ("Commerce") in connection with continuing orders for antidumping duties in Television Receivers, Monochrome and Color, from Japan, 56 Fed. Reg. 5,392 (Dep't Comm.1991) (final admin. reviews) ("Final Results") as modified by the Final Results of Redetermination Pursuant to Court Remand filed with the Court of International Trade on March 28, 1994 ("Remand Determination"). The appeal was submitted for decision after oral argument on February 8, 1996. Because FGL has failed to show reversible error of either a legal or factual nature, we affirm.

## BACKGROUND

The Final Results were based on three administrative reviews of an antidumping duty order covering television receivers, monochrome and color, from Japan, sold by FGL in the United States. The three reviews are: the eighth review, covering the period from March 1, 1986 to February 28, 1987; the ninth review, covering the period from March 1, 1987 to February 29, 1988; and the eleventh review, covering the period March 1, 1989 to February 28, 1990.

FGL sued in the Court of International Trade, challenging the determinations made in the Final Results. Commerce filed a motion requesting that the case be remanded to it with respect to seven of the issues raised, which motion the Court of International Trade granted on May 12, 1993. After the Remand Determination, issued on March 28, 1994, FGL renewed several claims before the Court of International Trade challenging Commerce's decision: (1) to use annual weighted-average cost of production ("COP") rather than monthly or quarterly weighted-average COP and to exclude below-cost sales of models VA–191.S and 19V–S1.B; (2) to use constructed value in lieu of third country sales in calculating the foreign market value ("FMV") for certain television receiver models with below COP home market sales; (3) to calculate the imputed interest adjustment to exporter's sales price based on actual time in inventory and actual value; and (4) to deny FGL's claim for a level of trade adjustment as untimely [1].

## COMMERCE'S DETERMINATIONS

### I. Sales Below Cost of Production

In order to compute antidumping duties, the FMV of the imported product is first calculated. In the Final Results, Commerce concluded that some of FGL's home market

---

[1]. Another claim initially pursued by FGL regarding Commerce's decision to adjust exporter's sales price downward for direct selling expenses is not being appealed because the issue had been conclusively determined in an intervening decision of this court. *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565 (Fed.Cir.1994).

sales of television models VA–191.S, VA–53.R, and 19V–S1.B were at prices below the COP and thus excluded those sales from the computation of the FMV. In addition, Commerce excluded from the FMV calculation all sales of a fourth model, V–45.S, pursuant to Commerce's "10/90/10" test which excludes all home market sales from a calculation of FMV if 90% of those sales were below COP. In the Remand Determination, Commerce concluded that its use of annual weighted-average COP and its exclusion of below-cost sales were justified, specifically finding that below COP sales of models VA–191.S and 19V–S1.B were not due to obsolescence or start-up costs.

## II. Constructed Value v. Third Country Sales

In the Final Results, Commerce used a constructed value, instead of third country sales, to calculate the FMV for certain model television receivers: namely, those for which there were insufficient above COP sales in FGL's home market. Commerce did so even though FGL had submitted pricing data for its sales of these televisions to a third country, Canada, during the eighth review period. Commerce concluded that 19 U.S.C. § 1677b requires it to employ a constructed value for determining the FMV where the home market is viable (*i.e.*, there is a sufficient number of sales) but where the sales are disqualified as below COP.

## III. Imputed Interest Adjustment

FGL made two types of sales in the United States during the eighth review period: Exporter Sales Price ("ESP") sales, to its U.S. subsidiary, Teknika Electronics Corp. ("Teknika"); and Purchase Price ("PP") sales to unrelated U.S. distributors. In the Final Results, Commerce made a downward adjustment to the ESP based on an imputed interest expense for the time that goods remained in Teknika's inventory. Commerce regularly does so in order to adjust for the lost opportunity cost incurred for merchandise purchased and held in inventory. In the present case, Commerce calculated the imputed interest adjustment on FGL's ESP sales through Teknika according to the actu-

al number of days that the goods remained in inventory and at their actual value, reasoning that method yielded the most accurate results.

## IV. Level of Trade Adjustment

Finally, FGL's sales to the United States were to wholesalers, either Teknika or unrelated distributors, whereas FGL's home market sales were to retail traders. In its December 9, 1987, questionnaire response regarding home market and U.S. sales, FGL reported that it sold to wholesalers in the United States and retailers in the home market, but neither requested a corresponding adjustment based on the differing levels of trade, nor provided any scheme for computing such a level of trade adjustment. FGL first contended in its pre-hearing briefs that Commerce was required to grant an adjustment for differences in the levels of trade because of the different types of buyers. In the Final Results, Commerce rejected FGL's request for a level of trade adjustment as untimely.

## COURT OF INTERNATIONAL TRADE RULINGS

On March 14, 1995, the Court of International Trade, after considering the submissions of the parties and the administrative record, issued its decision sustaining all of Commerce's challenged determinations and dismissing FGL's action. The Court of International Trade adopted Commerce's reasoning with respect to each issue and, in addition, found that FGL failed to provide sufficient information to support its claim for a level of trade adjustment.

FGL appeals, contending that the Court of International Trade erred in sustaining Commerce's decisions to exclude as below COP sales of certain models from its calculation of FMV, to use an actual time in inventory to calculate the imputed interest adjustment to ESP and to refuse an adjustment for the differences in levels of trade for lack of timeliness, because, FGL argues, the determinations were unsupported by substantial evidence on the record and otherwise not in accordance with law. In addition, FGL contends that the Court of International Trade erred in sustaining Commerce's decisions to

**1038**

use constructed value, rather than third country sales, to calculate FMV because the determination was based on an improper interpretation of the governing statute.[2]

STANDARD OF REVIEW

█ In reviewing injury, antidumping, and countervailing duty investigations and determinations, the Court of International Trade must sustain "any determination, finding or conclusion found" by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B). "However, '[t]o determine whether the Court of International Trade correctly applied [its] standard [of review] in reaching its decision, this court must apply anew the statute's express standard of review to the agency's determination.'" *NEC Home Elecs., Ltd. v. United States*, 54 F.3d 736, 742 (Fed.Cir. 1995) (citing *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed.Cir.1992)). That means we review the underlying Commerce determinations to see if they are supported by substantial evidence. Substantial evidence "means such relevant evidence as a reasonable mind might accept to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).

█ The proper interpretation of the governing statutes is reviewed de novo. *Zenith Elecs. Corp. v. United States*, 77 F.3d 426, 429 (Fed.Cir.1996); *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed.Cir. 1994). However, where Congress has failed to provide clear guidance on an issue, we defer to the interpretation Commerce has given its own governing statute. *See Zenith*, 77 F.3d at 430 ("[I]f there is no unambiguously expressed congressional intent, we must interpret the statute with deference to Commerce's interpretation...."); *Koyo Seiko*, 36 F.3d at 1573 ("In a situation where Congress has not provided clear guidance on an issue, Chevron requires us to defer to the agency's interpretation of its own statute as long as that interpretation is reasonable."). "In antidumping cases, we accord substantial

deference to Commerce's statutory interpretation, as the International Trade Administration is the 'master' of the antidumping laws." *Torrington Co. v. United States.*, 68 F.3d 1347, 1351 (Fed.Cir.1995).

ANALYSIS

I. Sales Below Cost of Production

FGL contends that Commerce improperly calculated COP and therefore inappropriately excluded certain sales from FMV. First, FGL argues, Commerce's use of annual weighted-average COP instead of a monthly or quarterly weighted-average COP improperly skewed the analysis and, in turn, led Commerce erroneously to conclude that prices were below COP. Second, FGL asserts that sales of models VA–191.S and 19V.S1B should not have been excluded from a calculation of FMV as below cost because the former was an obsolete model and Commerce failed to take into account start-up costs for the latter.

*A. Annual weighted-average cost*

█ In the Remand Determination, Commerce concluded that its use of annual weighted-average COP was justified as a reasonable and accurate measure of FGL's production costs and did not distort the analysis. Commerce cited that FGL's production costs tended to fluctuate on a monthly basis and that the use of an annual weighted-average COP would adjust for those fluctuations. Commerce also noted that the difference in FGL's costs between the beginning and end of the review period was not significant, and the quantity produced at lower cost was significantly less than that produced at higher cost. The Court of International Trade sustained Commerce's determination as being supported by substantial evidence.

FGL argues that the data it presented to Commerce clearly show that its cost of production continuously declined during the review period, except for a single increase in October due to increased labor costs. After the increase, its COP once again began a

**2.** FGL raises all contentions on appeal with respect to the eighth review period, but the same

issues arise in the ninth and eleventh review periods as well.

steady decline. FGL also faults Commerce's statement that most of the cost decline took place in the first two months of the review period.

This court has recognized that the antidumping statute "reveals tremendous deference to the expertise of the Secretary of Commerce in administering the antidumping law." *Smith–Corona Group v. United States*, 713 F.2d 1568, 1571, 1582 (Fed.Cir. 1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts. *United States v. Zenith Radio Corp.*, 64 C.C.P.A. 130, 562 F.2d 1209, 1216 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) (countervailing duty case involving subsidies). This deference is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise in identifying, selecting and applying methodologies to implement the dictates set forth in the governing statute, as opposed to interpreting the meaning of the statute itself where ambiguous.[3]

FGL does not put forth any practical evidence, analysis, or examples demonstrating that the use of the annual weighted-average COP produces distorted results in this case. Looking at the data provided to Commerce by FGL, it is possible to see trends of decline in the COP. However, as determined by Commerce and reiterated by the Court of International Trade, no persuasive analysis, if any, was provided to show that any such declines, viewed over the full review period, had any statistical significance, particularly in light of the October increases in COP.[4] "Fujitsu has produced no persuasive evidence to substantiate its claims that its COPs were declining at a significant rate. This is especially troublesome, in light of the fact that evidence on the record indicated rising labor costs." *Fujitsu*, 883 F.Supp. at 735. FGL merely states, in a conclusory manner, that "evidence of record confirms that FGL's production costs declined over the course of the eighth review period." That FGL can quibble with the description of trends in the Remand Determination does not establish reversible error, as we review decisions, not opinions. *See, e.g., American Med. Sys., Inc. v. Medical Eng'g Corp.*, 6 F.3d 1523, 1534 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994). Accordingly, the Court of International Trade's decision to sustain Commerce's use of annual weighted-average COP in calculating FMV as not based on less that substantial evidence was correct.

### B. Start-Up Costs and Obsolescence

FGL argues that below-cost sales of model VA–191.S should not be excluded from FMV because the model was in a "close-out" phase during the review period. In addition, FGL claims that below cost sales for model 19V–S1.B should not be excluded from FMV because of the model's start-up costs.

FGL cites passages from the legislative history of the statute to show that certain below COP sales that are consistent with normal business practices should not be disregarded as a basis for FMV:

> These [COP] standards would not require the disregarding of below-cost sales in every instance, for under normal business practice in both foreign countries and the United States, it is frequently necessary to sell obsolete or end-of-model year merchandise at less than cost. Similarly, certain products, such as commercial aircraft, typically require large research and development costs which could not reasonably

---

3. Often, our cases refer to the Chevron doctrine in according deference to interpretations of the trade statutes by Commerce and methodologies used in their application. *See, e.g., Koyo Seiko Co. v. United States*, 66 F.3d 1204, 1209 (Fed.Cir. 1995); *Torrington Co. v. United States*, 82 F.3d 1039, 1046 (Fed.Cir.1996), and cases cited therein. Nothing we do today affects the vitality of those decisions, where they apply.

4. In actuality, for the models for which FGL provided monthly COP data, the difference in COP between the first and last month of the review period are very small: on the order of 1% of the total cost of production. For one model, the COP was actually higher at the end of the review period than at the beginning.

be recovered in the first year or two of sales.

S.Rep. No. 1298, 93rd Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310. The government does not resist the import of the statement from the legislative history, but contends that it does not apply to the facts of the present case.

■ With respect to model VA–191.S, FGL claims that the below cost sales were made pursuant to normal business practice in liquidating close-out merchandise. Commerce rejected this view, noting that FGL made substantial numbers of below-cost sales during the five months preceding the cessation of production. FGL claims that production began to decrease several months before the end of production and sales were declining during those five months, which, FGL argues, was dispositive proof that sales of the model were in a liquidation phase. The Court of International Trade accepted Commerce's finding that FGL's argument that these sales represent liquidation of existing stock pursuant to normal business practice was not persuasive. The Court said, "Fujitsu's arguments that its below-cost sales were condonable as sales of obsolescent merchandise or in the alternative justified by start-up costs are not supported by evidence on the record." Neither can we discern from anything cited by FGL any reason to fault that finding. FGL failed to provide any convincing demonstration to Commerce that the below cost sales were due to liquidation. Here, it has failed to show that Commerce's finding is unsupported by substantial evidence.

■ With respect to model 19V–S1.B, FGL argues that any below COP sales were due to start-up costs incurred in the normal course of business. The government responds that, even if this were true, Commerce acted correctly because FGL failed to provide model-specific procuring and engineering costs. Without that model-specific data, Commerce has no way to determine what portion of the total procurement and engineering costs represent the start-up of model 19V–S1.B. FGL rejoins that Commerce should have used the allocated cost data it provided. Even though such a justification for below COP sales of television model 19V–S1.B might be found by sifting through FGL's allocated cost data, Commerce has reasonably placed the burden to establish entitlement to adjustments on FGL, the party seeking the adjustment and the party with access to the necessary information. See *Timken Co. v. United States*, 673 F.Supp. 495, 513 (Ct. Int'l Trade 1987). By failing to provide the detailed information and analysis necessary to establish entitlement to such an adjustment, FGL has failed to carry its burden of proof. As noted by the Court of International Trade, "[i]t is not Commerce's duty to investigate the extent to which Fujitsu's below-cost sales were due to start-up costs." *Fujitsu*, 883 F.Supp. at 735. Accordingly, we affirm the Court of International Trade's decision insofar as it sustains Commerce's determination to exclude, as below COP, sales of models VA–191.S and 19V–S1.B in calculating FMV.

## II. Constructed Value v. Third Country Sales

■ Commerce used a constructed value, instead of third country sales, to calculate FMV because there were insufficient above COP sales in FGL's home market. FGL argues, however, that the statutory provision regarding the calculation of FMV, 19 U.S.C. § 1677b, only authorizes the use of constructed value *after* Commerce determines that third country sales cannot be used. The government contends, on the other hand, that section 1677b *requires* that Commerce employ a constructed value where the home market is viable (*i.e.*, there is a sufficient number of sales) but the sales are disqualified as below COP. Commerce thus contends it *may not* use third country sales here. The Court of International Trade accepted this construction of the statute in sustaining Commerce's use of constructed value.

Whether 19 U.S.C. § 1677b requires the use of constructed value where there is a viable home market but insufficient number of sales above COP to form a basis for calculating FMV is a question of first impression for this court.[5] As with any question

5. Commerce and the Court of International Trade have long interpreted 19 U.S.C.

regarding statutory interpretation, the analysis must begin with an examination of the language of the statute itself. *Koyo Seiko*, 36 F.3d at 1570. Section 1677b states, in pertinent part:

(a) **Determination; fictitious market; sales agencies.** For the purposes of this subtitle—

(1) In general. The foreign market value of imported merchandise shall be the price

. . . . .

(A) at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption, or

(B) if not so sold or offered for sale for home consumption, or if the administering authority determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States,

. . . . .

(b) **Sales at less than cost of production.** Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, *or, as appropriate, to countries other than the United States,* have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise.

. . . . .

Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than the cost of production, are determined to be inadequate as a basis for the determination of foreign market value under subsection (a) of this section, *the administering authority shall employ the constructed value* of the merchandise to determine its foreign market value.

19 U.S.C. § 1677b (1988) [6] (emphasis added). FGL argues that, by stating "or, as appropriate, to countries other than the United States," section 1677b(b) requires that Commerce determine whether third country sales are *below cost before using* constructed value, even where home market sales were all below COP. The government argues, however, that the use in the final paragraph of the language "*shall* employ the constructed value" (emphasis added) does not provide it any authority or discretion to use other than constructed value where below COP sales prevent it from using home market sales to determine FMV.

§ 1677b(b) to require the use of constructed value where substantial home market sales have been made below COP and the remaining sales are inadequate as a basis for calculating FMV. *See Zenith Elecs. Corp. v. United States*, 872 F.Supp. 992, 999 (Ct. Int'l Trade 1994) ("When Commerce determines that sales of the 'such or similar' merchandise were made at below COP, and any remaining sales that were not made at below COP are inadequate as a basis for FMV, it is required to employ constructed value to determine FMV. 19 U.S.C. § 1677b(b) (1988).") (emphasis added); *Bomont Indus. v. United States*, 718 F.Supp. 958, 965 (Ct. Int'l Trade 1989) (The Court recognized that "sales below the cost of production ... over an extended period of time and in substantial quantities [would invoke] constructed value per 19 U.S.C. § 1677b(b). . . ."); *Hercules, Inc. v. United States*, 673 F.Supp. 454,

491 (Ct. Int'l Trade 1987) ("Foreign market value may be based upon the home market price, third country price, or constructed value. See § 1677b (1982). The ITA must disregard any sales in the home market if it finds that the price was below the manufacturer's cost of production (COP), 19 U.S.C. § 1677b(b) (1982); 19 C.F.R. § 353.7 (1982). If remaining sales are inadequate to form a basis for calculating foreign market value, the ITA is *required to use constructed value. Id.*") (emphasis added). The present case, however, is the first time this interpretation of the statute has been appealed to this court.

6. 19 U.S.C. § 1677b was modified in 1994. The statute provisions cited here, and throughout the opinion, are those provisions that were in effect during the subject reviews.

Section 1677b provides a straightforward, sequential plan for determining what method must be employed in determining FMV. First, section 1677b(a)(1)(A) provides that, in most situations, FMV will be calculated based on sales "in the principal markets of the country from which exported." However, where there is an insufficient number of sales in the home market, section 1677b(a)(1)(B) dictates that third country sales shall be used to calculate FMV. Section 1677b(b), however, creates an exception to the statutory method laid out in 1677b(a) whenever sales were below COP. It dictates that, where "sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States" are determined to be below cost of production, then "the administering authority shall employ the constructed value."

The analysis required by section 1677b(b) is subordinate to the analysis set forth in section 1677b(a)(1). Thus, if home market sales are sufficient to form an adequate basis for comparison with sales in the United States, then section 1677b(a)(1)(A) applies, and Commerce must use home market sales to determine FMV. Commerce must then determine whether those home market sales are below COP, and, if they are, must use a constructed value for FMV. However, if there is an insufficient number of home market sales to form an adequate basis for comparison with sales in the United States, third country sales are to be used, according to section 1677b(a)(1)(B), and then Commerce must determine whether those third country sales are below COP. If those sales are below COP, then Commerce shall use constructed value to determine FMV. It is thus clear that Commerce may analyze third country sales data only when there is an insufficient number of sales in the home market. It is undisputed that, in this case, apart from being below COP, there was a sufficient number of sales in FGL's home market for a calculation of FMV.

FGL argues, however, that the phrase "or, as appropriate, to countries other than the United States" (emphasis added) requires that Commerce use third country sales unless they are also found to be below COP. It

appears, then, that FGL would have us interpret this portion of 1677b(b) as if it read "and" instead of "or." FGL's interpretation of the statute is neither linguistically sound, logical, nor consistent with the statute as a whole. Thus, it must be rejected.

Further, apart from the plain language of the statute, discussed above, FGL's reading of section 1677b(b) could lead to absurd results. Consider the following example: Exporter sells a large quantity of a product in its home market. Commerce determines, under section 1677b(a)(1), that it must use home market sales to determine FMV because they are sufficiently numerous to provide an adequate basis for comparison with sales in the U.S. Commerce then looks to section 1677b(b) and determines that the home market sales were below COP. Under FGL's interpretation, Commerce must then look to third country sales to see if they were also below COP. Assume, for the purpose of this example, that the third country sales were not below COP. Accordingly, under FGL's construction of the phrase "or, as appropriate, to countries other than the United States," section 1677b(b) does not apply. If section 1677b(b) does not apply, Commerce is left with its initial position that home market sales are to be used to calculate FMV. There are no provisions in the statute to authorize Commerce to reverse its initial decision to use home market sales (because they are sufficiently numerous) and instead use third country sales to calculate FMV in this situation. In that situation, Commerce would necessarily be required to use the below COP home market sales to calculate the FMV, a result clearly not intended by the drafters of the statute and, indeed, an absurd result. Congress could not have been more clear that below COP sales were not to be relied upon.

In addition, one of the primary reasons Congress changed the law to instruct Commerce to use constructed value was that, when exporter home market sales are below COP, there is a greater likelihood that third country sales are also below COP.

The preference expressed [for third country sales] in present law can, in some cases, unnecessarily prolong an investiga-

tion. For example, where sales in the exporter's home market are found to be below cost of production, present law directs the Secretary to look to prices in third country markets. However, frequently if a producer is selling below cost in his home market, he is also selling below cost in export markets. Valuable time was lost in determining that third country prices are also inadequate as a basis for foreign market value.

S.Rep. No. 249, 96th Cong., 1st Sess. 95–96 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 481–82.[7] Requiring Commerce to perform the analysis with third country sales would eliminate the very benefit of efficiency the change in law directing use of constructed value was designed to accomplish in the first place.

Section 1677b is not ambiguous, and Commerce clearly complied with it in this case. In addition, if the statute were ambiguous, we would accord great deference to the agency's interpretation, provided it was reasonable. *Koyo Seiko*, 36 F.3d at 1573. "To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation." *Id.* at 1570 (emphasis in original). Here, Commerce's interpretation is correct and in any event a reasonable one. In that regard, the Court of International Trade stated:

> 19 U.S.C. § 1677b(b) mandates the use of [constructed value] when Commerce is unable to determine FMV of respondent's home market sales due to below-cost sales. By comparison, 19 U.S.C. § 1677b(a)(1) mandates that sales to third countries are intended to be utilized in computing dumping margins only as a secondary or residual basis of comparison when the quantity of merchandise sold in the country of expor-

tation is nonexistent or so small as to be an inadequate basis of comparison.

*Fujitsu*, 883 F.Supp. at 736. Accordingly, the Court of International Trade properly sustained Commerce's use of constructed value in calculating FMV as in accordance with law.

### III. Imputed Interest Adjustment

FGL alleges reversible factual error because Commerce calculated an imputed interest adjustment on FGL's ESP sales through Teknika based on the actual number of days that the goods remained in inventory. FGL argues that this way to calculate interest was improper and that, instead, either a median number of days must be used, or, if the actual number of days is used, the inventory must be valued at cost or at market levels (whichever is lower) rather than at full value.

██ FGL argues that the use of actual time in inventory to calculate interest is unreasonable because it improperly penalizes FGL for providing more accurate information. It cites no authority on point. In any event, Commerce has the right to use data which the statute requires the exporter to provide, and whether the data advantages or disadvantages the exporter is irrelevant.

Second, because time in inventory is generally out of its control, FGL argues it should not be penalized for long inventory times, citing *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924, 933, 2 Fed. Cir. (T) 57, 68 (1984) ("A finding of [less than fair value] sales based on a margin resulting *solely* from a factor beyond the control of the exporter would be unreal, unreasonable, and unfair."). The government responds that Commerce must impute interest to adjust for the cost of "missed opportunity," and the interest should be estimated as accurately as possible to reflect the actual cost incurred.

7. The legislative history proceeds to state that, despite the modification of the preference in section 773 of the Tariff Act for the use of third country prices over constructed value, "[n]evertheless, third country prices will normally be preferred over constructed value...." *Id.* It is not in dispute, however, that, in most situations, third country prices are preferred over constructed value. For example, where there are insufficient home market sales, third country prices

may only be abandoned in favor of constructed value if there is an adequate factual basis for doing so. *Floral Trade Council v. United States*, 775 F.Supp. 1492, 1496 (Ct. Int'l Trade 1991), *aff'd*, 74 F.3d 1200 (Fed.Cir.1996). That is not true, as the statute clearly indicates, in the situation where there is a sufficient number of home market sales, but they are below COP. In that case, the use of constructed value to calculate FMV is required. *See supra.*

Using actual transaction-specific data would obviously result in the most accurate calculation of imputed interest. Logically, Commerce is correct that the most accurate gauge for determining imputed interest should be utilized. Otherwise, an inadequate result occurs unnecessarily.

In addition, FGL notes that, in the past, Commerce has used an average time where transaction-specific data was not available. *See, e.g., Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan,* 58 Fed. Reg. 30,018, 30,021 (Dep't Commerce 1993) (final admin. review). This practice, however, is not applicable where, as here, such data is available. In addition, prior administrative reviews have calculated FGL's imputed interest in the same manner as the present case. *Television Receivers, Monochrome and Color, from Japan,* 53 Fed. Reg. 4050, 4054 (Feb. 11, 1988) (comment 39). Thus, Commerce is following a consistent practice.

 Finally, FGL argues that it is unfair and contrary to generally accepted accounting principles ("GAAP") to impute interest based on the full value of merchandise, no matter how long the goods are in inventory. FGL argues that some merchandise stays in inventory for lengthy periods due to obsolescence and salability, and its value decreases with time. The government contests FGL's assertion that the use of actual inventory is contrary to commercial reality. More importantly, however, no evidence appears to have been introduced by FGL as to the actual effect of this method of calculation. Nor has there been any evidence submitted, beyond a reference to FGL and Teknika's own accounting procedures, to support FGL's broad, disputed assertion that Commerce's practice is not in accordance with GAAP.

On this record, the CIT found that "[t]he use of actual transaction specific data would result in the most accurate calculation of the imputed interest adjustment," and, therefore, "Commerce's use of actual inventory periods to calculate the imputed interest expense was reasonable and in accordance with law." *Fujitsu,* 883 F.Supp. at 738. Accordingly, we have no basis on which to conclude that the

Court of International Trade erred in its finding, for want of substantial evidentiary support. The burden of proof was on FGL, and the Court of International Trade effectively found a failure of proof.

 Moreover, this court accords deference to the determinations of the agency that turn on complex economic and accounting inquiries. The methodologies relied on by Commerce in making its determinations are presumptively correct. Thus, even if the evidence is viewed as substantial on both sides we would still affirm. *Accord Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933, 3 Fed. Cir. (T) 44, 51 (1984) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

As, under this test, the Court of International Trade's finding is certainly supported by "such relevant evidence as a reasonable mind might accept to support a conclusion," the Court of International Trade's decision insofar as it sustains Commerce's use of actual inventory time and value to impute interest is affirmed. As to the contention on GAAP, the CIT, like Commerce, was not shown to be wrong.

## IV. Level of Trade Adjustment

FGL argues that Commerce's refusal to adjust for differences in the level of trade between the purchase price of its U.S. sales to wholesale distributors and that of home market sales to retailers is unsupported by substantial evidence and otherwise not in accordance with law.

In its December 9, 1987, questionnaire response regarding home market and U.S. sales, FGL reported that it sold directly to retail traders in the home market and to the wholesalers in the United States. Nevertheless, although the questionnaire contains a place for the respondent to claim a level of trade adjustment and supply any pertinent information, FGL failed to do either. In its questionnaire response, however, FGL did clearly request two other adjustments: a quantity adjustment and a circumstances of sale adjustment. It was not until the post-

preliminary determination hearing stage, however, that FGL first asserted a right to a level of trade adjustment. Commerce denied the claim as untimely. The Court of International Trade sustained Commerce's rejection of the request for a level of trade adjustment for lack of timeliness. The Court also found that FGL had failed to support a level of trade adjustment with its later-reported data.

 FGL argues that its claim for a level of trade adjustment was timely because there is no statute or regulation which specifically sets forth a particular deadline and because this court has already held, in *NEC Home Electronics,* that a claim for level of trade adjustment first appearing in the pre-hearing briefs is properly made. The authority cited by FGL is unpersuasive because its import is not accurately described. The prior level of trade adjustment determinations made by Commerce and cited by FGL were all made after a level of trade adjustment was requested in response to Commerce's questionnaire, not first asserted in pre-hearing briefs. Also, in *NEC Home Electronics,* NEC provided an alternate means of computation in its pre-hearing brief, in case the method originally proposed in response to the questionnaire was rejected. The level of trade adjustment claim, however, was initially made in response to the questionnaire. 54 F.3d at 740.

In addition, FGL claims that the data necessary to make a level of trade adjustment was made available 2½ years prior to the hearing and that Commerce thus had ample opportunity to analyze the data. However, as Commerce was not made aware that FGL claimed a level of trade adjustment until the pre-hearing briefs, the actual time was short.[8]

The government argues, and FGL concedes, that Commerce has "broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data."

*Magyar Gordulocsapagy Muvek v. United States,* 890 F.Supp. 1111, 1115 (Ct. Int'l Trade 1995) *(citing Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 544–45, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978)). Although no regulation specifies the time within which a level of trade adjustment claim must be made, it is undisputed that the questionnaire specifically asks whether the party wants to seek such a level of trade adjustment and requests all relevant information regarding such an adjustment. It is reasonable for Commerce to request that a claim for a level of trade adjustment be made in the questionnaire response and to require that it be made at least a reasonable amount of time prior to the post-preliminary determination hearing. *Accord Floral Trade Council v. United States,* 704 F.Supp. 241, 243 (Ct. Int'l Trade 1988) (Below cost of production investigation request held untimely when petitioner first "raised the issue in its post-preliminary determination pre-hearing brief."); *Roller Chain, Other Than Bicycle, From Japan,* 57 Fed.Reg. 56,319, 56,321 (Dep't Comm.1992) (final admin. review) ("Certain information alleged to support a level-of-trade adjustment was submitted for the first time in the case brief prior to the hearing, and thus was disregarded as untimely."). Neither occurred here. Initiating one's level of trade adjustment claim in the pre-hearing brief stage offers the government inadequate time to analyze the data previously submitted but without a claim of entitlement to a level of trade adjustment. Commerce cannot reasonably be required to analyze data under every possible claim that could later be made.

 Finally, the Court of International Trade found that data supplied by FGL was inadequate, especially because no method was proposed by which a level of trade adjustment could be calculated. FGL argues that this is a *post hoc* justification which was not raised by Commerce at the hearing and cannot be considered here. To qualify for a level of trade adjustment, it was FGL's burden to prove: (1) Commerce compared sales at different levels of trade; and (2) this

---

**8.** FGL claims to have submitted data that could support a level of trade adjustment in February 1988. However, there were only two weeks between FGL's November 21, 1990, pre-hearing brief submission, in which the level of trade adjustment was first requested, and the December 5, 1990, hearing.

resulted in undue price differences. *See NAR, S.p.A. v. United States,* 707 F.Supp. 553, 557 (Ct. Int'l Trade 1989). In addition, FGL must provide evidence justifying a proposed methodology that would allow Commerce to quantify the requested adjustment. *Silver Reed Am., Inc. v. United States,* 711 F.Supp. 627, 630–31 (Ct. Int'l Trade 1989). FGL failed to make the proper evidentiary showing to support a level of trade adjustment in a timely manner, and, even in its pre-hearing brief, FGL still failed to provide evidence and propose a methodology that would enable Commerce to accurately quantify the adjustment. The Court may always rely on one's failure to carry his burden of proof absent a stipulation to the facts necessary to carry that burden. As accurately stated by the Court, "[i]t is Fujitsu who has the burden of supporting its claim for a level of trade adjustment and not Commerce … Fujitsu has failed to meet that burden." *Fujitsu,* 883 F.Supp. at 740. The determination of the Court of International Trade, therefore, was not a *post hoc* rationalization of Commerce's rejection of FGL's claim for a level of trade adjustment but a proper finding based on the evidentiary standard necessary to overturn an adverse Commerce decision concerning a claim for level of trade adjustment in a suit in the Court of International Trade.

Accordingly, the Court of International Trade properly sustained Commerce's decision to reject FGL's claim for a level of trade adjustment as being untimely because Commerce did not abuse its discretion given the shortness of time, and the Court's alternative ground based on its finding that FGL failed to carry its burden of proof was also proper as not lacking substantial evidentiary support.

## CONCLUSION

For all the foregoing reasons, the judgment of the United States Court of International Trade upholding all of Commerce's determinations that FGL challenged is

AFFIRMED.