Slip Op. 25-127

# UNITED STATES COURT OF INTERNATIONAL TRADE

COMPANIA VALENCIANA DE
ALUMINIO BAUX, S.L.U. AND
BANCOLOR BAUX, S.L.U.,

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

ALUMINUM ASSOCIATION TRADE
ENFORCEMENT WORKING GROUP
AND ITS INDIVIDUAL MEMBERS
ARCONIC CORP., ET AL.,

Defendant-Intervenors.

Before: Mark A. Barnett, Chief Judge
Court No. 23-00259

## OPINION

[Sustaining the U.S. Department of Commerce's administrative review of the antidumping duty order on common alloy aluminum sheet from Spain.]

Dated: September 25, 2025

Bryan P. Cenko, Mowry & Grimson, PLLC, of Washington, DC, argued for Plaintiffs Compañia Valenciana De Aluminio Baux, S.L.U. and Bancolor Baux, S.L.U. On the brief were Jeffrey Grimson and Kristin H. Mowry.

Kyle S. Beckrich, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant United States. On the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Christopher Kimura, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members.  On the brief was <u>John M. Herrmann</u>.

Barnett, Chief Judge:  Before the court is a motion for judgment on the agency record pursuant to U.S. Court of International Trade Rule 56.2 challenging the final results of the U.S. Department of Commerce's ("Commerce" or "the agency") administrative review of the antidumping duty order on common alloy aluminum sheet ("CAAS") from Spain.  Confid. Mem. of P. &. A. in Supp. of Rule 56.2 Mot. for J. on the Agency R. of Pls. Compañia Valenciana De Aluminio Baux, S.L.U. and Bancolor Baux, S.L.U. ("Pls.' Mem."), ECF No. 29; *see also* Confid. Reply Br. of Pls. Compañia Valenciana De Aluminio Baux, S.L.U. and Bancolor Baux, S.L.U ("Pls.' Reply"), ECF No. 41; *see also Common Alloy Aluminum Sheet From Spain*, 88 Fed. Reg. 76,722 (Dep't Commerce Nov. 7, 2023) (final results of antidumping duty admin. rev.; 2020–2022) ("*Final Results*"), and accompanying Issues and Decision Mem., A-469-820 (Nov. 1, 2023) ("I&D Mem."), PR 134, CJA Tab 19.[1]

Plaintiffs are Compañia Valenciana De Aluminio Baux, S.L.U. ("Baux") and Bancolor Baux, S.L.U. ("Bancolor") (collectively "Plaintiffs").[2]  Baux is a Spanish supplier

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 21-2, and a Confidential Administrative Record ("CR"), ECF No. 21-3.  The parties submitted a joint appendix containing record documents cited in their briefs.  *See* Confid. J.A. ("CJA"), ECF No. 43; Public J.A., ECF No. 44.  The court references the confidential version of the relevant record documents, unless otherwise specified.

[2] Both Commerce and Baux (as the combined respondent below and in briefing to the court) used "Baux" sometimes to refer to the collective entity and at other times to refer to the individual entity.  For clarity, the court will refer to Baux and Bancolor, collectively,

of subject aluminum sheet and mandatory respondent in the review.  Baux and Bancolor are both owned by Grupo Baux.  Sec. A Resp. (July 29, 2022) ("Baux Sec. A Resp.") at A-25, CR 5–12, PR 32–33, CJA Tab 3.  Bancolor is a Baux affiliate that purchases, further processes, and resells Baux-produced CAAS.  *Id.* at A-16, A-25.  "Madrid DC" refers to Bancolor's distribution center in Madrid, Spain.  *Id.* at A-17.

Plaintiffs commenced this action and seek judgment on the agency record because, in their view, certain aspects of Commerce's *Final Results* were not supported by substantial evidence and were otherwise not in accordance with law.  Pls.' Mem. at 11–12.  Commerce found that Plaintiffs sold CAAS in the home market at only one level of trade ("LOT") and, therefore, an LOT adjustment was not warranted.  I&D Mem. at 8.  Plaintiffs challenge the agency's application of 19 C.F.R. § 351.412(c)(2) and claim that the regulation is not in accordance with law.  Pls.' Mem. at 11.  Plaintiffs further challenge Commerce's finding of only one level of trade in the home market.  *Id.*

Defendant United States ("the Government") and Defendant-Intervenors Aluminum Association Trade Enforcement Working Group and its Individual Members urge the court to sustain the *Final Results*.  Confid. Def.'s Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 34; Def.-Ints.' Resp. in

---

as "Plaintiffs," even with regard to the administrative proceeding below, and only use "Baux" to refer to the individual entity.

Opp'n to Pls.' Mot. for J. on the Agency R., ECF No. 36.[3]  For the reasons discussed herein, the court sustains the *Final Results*.

## BACKGROUND

On April 27, 2021, Commerce issued an antidumping duty order on CAAS from Spain.  *See Common Alloy Aluminum Sheet From Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey*, 86 Fed. Reg. 22,139 (Dep't Commerce Apr. 27, 2021) (antidumping duty orders).

On June 9, 2022, Commerce initiated the first administrative review of that order on CAAS.  *Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 87 Fed. Reg. 35,165, 35,169 (Dep't Commerce June 9, 2022).  The period of review ("POR") was October 15, 2020, through March 31, 2022.  *Id.*  Plaintiffs received and submitted answers to Commerce's antidumping questionnaire and supplemental questionnaires. *See, e.g.*, Baux Sec. A Resp.; Baux Suppl. Sec. A–C Questionnaire Resp. Part I – Sec. B, Questions 8 & 9 (Mar. 30, 2023), CR 114–16, PR 82–83, CJA Tab 10.  Plaintiffs reported six channels of distribution within three levels of trade in the home market. Baux Suppl. Sec. A Resp. (Jan. 17, 2023) at 8, CR 62, PR 59, CJA Tab 7.

On May 5, 2023, Commerce published its preliminary results.  *See Common Alloy Aluminum Sheet From Spain*, 88 Fed. Reg. 29,090 (Dep't Commerce May 5,

---

[3] The Individual Members consist of Arconic Corporation; Commonwealth Rolled Product, Inc.; Constellium Rolled Products Ravenswood, LLC; JW Aluminum Company; Novelis Corporation; and Texarkana Aluminum, Inc.  Defendant-Intervenors incorporate the Government's arguments by reference and make no additional arguments.

2023) (prelim. results of antidumping duty admin. rev.; 2020–2022), PR 103, CJA Tab 13, and accompanying Prelim. Issues and Decision Mem., A-469-820 (Apr. 28, 2023) ("Prelim. Dec. Mem."), PR 97, CJA Tab 12.  Therein, Commerce determined that Plaintiffs did not satisfy their burden to demonstrate three levels of trade in the home market.  Prelim. Dec. Mem. at 10.

For the *Final Results*, Commerce considered the information and arguments provided by Plaintiffs and again determined that Plaintiffs sold CAAS in the home market at only one level of trade, and therefore an LOT adjustment was not warranted or possible.  I&D Mem. at 8.  Plaintiffs had grouped their selling functions into three purported levels of trade: "(1) sales made directly from Baux to unaffiliated customers; (2) downstream sales of Baux's aluminum sheet, which . . .  Bancolor sold to unaffiliated customers; and (3) downstream sales of Baux's aluminum sheet which Bancolor's Madrid DC resold to unaffiliated customers."  *Id.* at 13.  Plaintiffs claimed that they performed "selling functions" at different levels of intensity for each of these three levels of trade.  *Id.* at 7.  Commerce, however, found that Plaintiffs "failed to substantiate [their] intensity designations for [their] selling functions, despite multiple requests that it do so."  *Id.* at 14.  In particular, Plaintiffs asserted that they engaged in payment collection at different levels of intensity for each of the three claimed levels of trade.  *Id.* at 7, 14.  Commerce found that Plaintiffs identified no record evidence that they performed different activities with respect to payment collection or that any differences "translated into actual actions taken by [their] administrative staff."  *Id.* at 14.

Commerce also rejected Plaintiffs' argument that sales through Bancolor and Madrid DC occurred at a more remote level of trade than Baux's direct sales. *Id.* at 14–15. Commerce found that while Plaintiffs may have described some customers differently, Madrid DC's customers are "not necessarily more remote" than Baux's direct customers. *Id.* at 15 & n.58. Commerce found that Plaintiffs "did not explain what constitutes a 'distribution center customer,'" and that those "distribution center customers" which were end users "may be equally remote from the factory as Baux's direct customers." *Id.* at 15 n.58. Commerce also explained that it otherwise made normal value adjustments for any further processing, warehousing, repacking, and commission expenses incurred, and Plaintiffs failed to justify any LOT adjustment based on these activities. *Id.* at 16.

Plaintiffs also argued that Commerce's application of 19 C.F.R. § 351.412(c) conflicts with 19 U.S.C. § 1677b(a)(7)(A) and the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ("SAA"), because the regulation requires "substantial differences in selling activities," which is "not otherwise provided for in the statute." Case Br. (Aug. 18, 2023) at 13, CR 146–48, PR 120–22, CJA Tab 17; *see also* I&D Mem. at 5 & nn.20–21 (citing Case Br. at 19). In other words, Plaintiffs claimed that *any* difference in selling activities was sufficient under the statute to indicate a difference in level of trade. For the *Final Results*, Commerce rejected Baux's interpretation of the statute and the SAA, explaining that the statute does not define

level of trade and concluding that Plaintiffs made home market sales at only one level of trade.  I&D Mem. at 10, 14.

Commerce calculated a 10.38 percent weighted-average dumping margin for Plaintiffs.  *Final Results*, 88 Fed. Reg. at 76,723.  This litigation followed.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018),[4] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.    Legal Framework

Generally, normal value is the "price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).  Although determining the level of trade at which a sale (U.S. or normal value) is made is relevant to the price comparison that Commerce must make, the statute does not define the term level of trade.  Elsewhere, however, the statute discusses the requirements for Commerce to make a level of trade adjustment:

> The [normal value] shall also be increased or decreased to make due
> allowance for any difference (or lack thereof) between the export price

---

[4] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless otherwise stated.

or constructed export price and the price described in paragraph (1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade--(i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined . . . .

*Id.* § 1677b(a)(7)(A).

In its implementing regulations, Commerce explained that it would find sales to be made at different levels of trade

if they are made at different marketing stages (or their equivalent). Substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing. Some overlap in selling activities will not preclude a determination that two sales are at different stages of marketing.

19 C.F.R. § 351.412(c)(2).

II.    **Parties' Contentions**

Plaintiffs first contend that Commerce's regulatory test for determining levels of trade is not in accordance with law. Pls.' Mem. at 11. Plaintiffs argue that the regulation's "substantial differences" language imposes an "intensity requirement" that conflicts with the statute. *Id.* Plaintiffs interpret the statute to require that Commerce make an LOT adjustment "when there is *any* difference in selling functions." *Id.* (emphasis added).

Second, Plaintiffs contend that Commerce's finding of only one home market level of trade is not supported by substantial evidence. *Id.* Plaintiffs argue that "[t]he

only reasonable reading of the record is that three distinct LOTs existed in [Plaintiffs']

home market." *Id.* Baux contends:

> 1) different channels of distribution existed in the home market whereby Bancolor and Madrid DC served as resellers of Baux's CAAS, 2) Bancolor and Madrid DC performed different selling functions in the home market[,] and 3) where Baux and its affiliates performed the same selling functions in all three LOTs in the home market, they did so a[t] differing intensity levels.

*Id.* at 11–12.

The Government contends that 19 C.F.R. § 351.412(c) is consistent with the

statute and the SAA.[5] Def.'s Resp. at 10–11. According to the Government, the statute

provides Commerce with guidance on "how to account for" differences in level of trade

when Commerce determines that multiple levels of trade exist and does not require

Commerce to make an LOT adjustment whenever there are "any differences" in selling

activities. *Id.* at 10. The Government further contends that substantial evidence

supports Commerce's determination that there was only one level of trade in the home

market. *Id.* at 11.

In reply, Plaintiffs argue that the court need not defer to Commerce to determine

the best interpretation of 19 U.S.C. § 1677b(a)(7)(A), particularly since the U.S.

Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 411

(2024). Pls.' Reply at 1–2. Plaintiffs contend that the court is now tasked with

determining the "best" interpretation of 19 U.S.C. § 1677b(a)(7)(A) and that the best

---

[5] The SAA is the authoritative interpretation of the statute and reflects congressional intent. 19 U.S.C. § 3512(d).

interpretation is that *any* difference in selling activities is sufficient to establish a different level of trade.  *Id.* at 3, 8.

###   III.      The Regulation is Consistent with the Statute

Plaintiffs contend that the regulation's "substantial differences in selling activities" requirement is inconsistent with the statutory language which allows an LOT adjustment for "any difference" in selling activities.  Pls.' Mem. at 14–16.  Plaintiffs further contend that the best interpretation of 19 U.S.C. § 1677b(a)(7)(A) is that "<u>any</u> difference in selling activities" is "sufficient to establish a difference in LOTs."  Pls.' Reply at 6.  Plaintiffs also claim that the use of the word "involves" in 19 U.S.C. § 1677b(a)(7)(A) ("if the difference in level of trade – (i) involves the performance of different selling activities") does not mean that the performance of different selling functions is a distinct concept from a level of trade.  *Id.* at 8–9.

As the court has discussed in several recent decisions, while the meaning of a statutory term is a legal question, the application of that term to the record is a factual determination for the agency.  *See Jiangsu Dingsheng New Materials Joint-Stock Co. v. United States*, Slip Op. 25-93, 2025 WL 2092386 (CIT July 21, 2025) (citing *Seven Cnty. Infrastructure Coal. v. Eagle County*, 145 S. Ct. 1497, 1504 (2025)); *Hanon Sys. Ala. Corp. v. United States*, Slip Op. 25-94, 2025 WL 2028398 (CIT July 21, 2025) (same); *see also Loper Bright*, 603 U.S. at 389–391.

When deciding the statutory meaning of a word or phrase, courts exercise their independent judgment.  *Loper Bright*, 603 U.S. at 412.  Courts use the traditional tools of statutory interpretation, the "statute's text, structure, and legislative history, and apply

the relevant canons of interpretation." *Jiangsu*, 2025 WL 2092386, at *6 (quoting

*Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).  In addition, "the

contemporary and consistent views of a coordinate branch of government can provide

evidence of the law's meaning." *Bondi v. VanDerStock*, 145 S. Ct. 857, 874 (2025)

(citing *Loper Bright*, 603 U.S. at 394).  Thus, when an agency faces "fact-dependent,

context-specific, and policy-laden choices about the depth and breadth of its inquiry,"

the "[c]ourts should afford substantial deference and should not micromanage those

agency choices so long as they fall within a broad zone of reasonableness." *Seven*

*Cnty. Infrastructure Coal.*, 145 S. Ct. at 1513 (discussing the National Environmental

Protection Act).  In the context of the unfair trade laws, the SAA confirms that Congress

intended "that Commerce [would] amend the applicable regulations . . . to reflect the

changes" in antidumping and countervailing duty laws adopted in the Uruguay Round

Agreements Act ("URAA").  SAA at 820; 1994 U.S.C.C.A.N. at 4161.  Following

passage of the URAA, Commerce undertook a notice and comment rulemaking, to

advise parties how the agency defined level of trade through its promulgation of 19

C.F.R. § 351.412(c).  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296,

27,371 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*").

Here, in the first instance, the court must only resolve whether the regulation's

"substantial differences" requirement is inconsistent with 19 U.S.C. § 1677b(a)(7)(A).

Contrary to Baux's contention, the statute does not require a level of trade adjustment

for *any* difference in selling activities.

The analysis begins with the text of the statute. It is plain from the language of the statute that, while section 1677b(a)(7)(A) provides for an adjustment to account for differences in level of trade when certain conditions are met, the statute does not expressly define what constitutes a level of trade. The statutory structure also does not require Commerce to recognize a distinct level of trade in connection with any differences in selling activities. Relevant here, the statute provides that, to be eligible for an LOT adjustment, the difference in level of trade must "involve[] the performance of different selling activities." 19 U.S.C. § 1677b(a)(7)(A). Thus, the statute does not equate different levels of trade with different selling activities; rather, the latter is a necessary element for an *adjustment* based on the former.[6]

The regulation, meanwhile, provides rules for Commerce to identify different levels of trade. The regulation defines differences in levels of trade as sales "made at different marketing stages." 19 C.F.R. 351.412(c)(2). The regulation further explains that "[s]ubstantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stage of marketing." *Id*. Consistent with the statute, the regulation ensures that identifying a difference in the level of trade will involve different selling activities. The statute does not *require*

---

[6] Plaintiffs point out, and the court acknowledges, that the SAA provides, among other things, that "[w]here it is established that there are different levels of trade based on the performance of different selling activities, but the data establish that there is a pattern of no price differences, the level of trade adjustment will be zero." SAA at 830, 1994 U.S.C.C.A.N. at 4168. Read in context, the point of this language is to emphasize that a level of trade adjustment is not automatic, even when differences in level of trade involve different selling activities. Such a reading avoids placing the SAA language in contravention of the language of the statute itself.

Commerce to find any difference in selling activities to suffice for finding a different level of trade but simply requires the involvement of different selling activities.  The statute effectively sets the baseline for Commerce's LOT analysis, not its outer limits.  Thus, Commerce's regulation is not inconsistent with the statute.

In many ways, Baux's arguments seek to reopen the discussion that occurred some 30 years ago, as Commerce was drafting the level of trade regulation to implement the then-new statutory provision.  The agency's summary and resolution of the debate about the appropriate relationship between levels of trade and selling activities is worth revisiting at length:

> Paragraph (c)(2) [of 19 C.F.R. § 351.412, defining level of trade,] describes how the [agency] will determine whether two sales were made at different levels of trade.  We have modified the proposed regulation to provide that the [agency] will not identify levels of trade based solely on selling activities.  We have made this change in order to avoid any implication that every substantial difference in selling functions or activities constitutes a difference in the levels of trade.

> Numerous commenters stated that the proposed regulation appeared to be inconsistent with the statute because it based the identification of levels of trade on the identification of different selling activities.  These commenters argued that the statute requires that the [agency] identify levels of trade first, and that it consider selling activities only to determine whether an LOT adjustment is authorized.

> Other commenters asserted that the proposed regulation appropriately made differences in selling activities the test for identifying levels of trade.  These commenters argued, however, that the [agency] should not merely count the number of different selling activities, but instead should take a qualitative approach, weighing the extent and importance of each selling activity.

> In the [agency's] view, while neither the statute nor SAA defines level of trade, [19 U.S.C. § 1677b](a)(7)(A)(i) of the Act provides for LOT adjustments where there is a difference in levels of trade and the

difference "involves" the performance of different selling activities.  Thus, the statute uses the term "level of trade" as a concept distinct from selling activities.  The SAA at 829, *reprinted in* 1994 U.S.C.C.A.N. 4040 at 4168, reinforces this point by explaining that the [agency] must analyze the functions performed by the sellers, but need not find that two levels involve no common selling activities before finding two levels of trade.  In other words, the statute indicates that two sales with substantial differences in selling activities nevertheless may be at the same level of trade, and the SAA adds that two sales with some common selling activities nevertheless may be at different levels of trade.  Taken together, the two points establish that an analysis of selling activities alone is insufficient to establish the LOT.  Rather, the [agency] must analyze selling functions to determine if levels of trade identified by a party are meaningful.  In situations where some differences in selling activities are associated with different sales, whether that difference amounts to a difference in the levels of trade will have to be evaluated in the context of the seller's whole scheme of marketing.

If the [agency] treated every substantial difference in selling activities as a separate LOT, the Department potentially would be required to address dozens of levels of trade — many of which would be artificial creations.  In addition to being extremely burdensome, this would make the [agency] less likely to find "patterns of consistent price differences" between the apparently different levels of trade.  This would result either in denial of LOT adjustments altogether or routine use of the CEP offset.  Neither of these results was intended by the URAA.

*Preamble*, 62 Fed. Reg. at 27,371.

Plaintiffs have failed to make the case that the agency's interpretation, as represented by 19 C.F.R. § 351.412(c)(2), is inconsistent with the statute.[7]  The court

---

[7] To the extent that Plaintiffs seek to make a facial challenge to the regulation, any such challenge has not been developed and is otherwise waived.  Moreover, it remains good law that Commerce's LOT regulation "would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Plaintiffs do not make such a case.

need not defer to Commerce's interpretation of the statute to agree and accept the

agency's well-reasoned, "contemporary and consistent views." *VanDerStock*, 145 S.

Ct. at 874. To that end, the court rejects Plaintiffs' argument that 19 C.F.R.

§ 351.412(c)(2) is inconsistent with the statute.

### IV.     Commerce's Denial of a Level of Trade Adjustment is Supported by Substantial Evidence

Plaintiffs contend that substantial evidence supports a finding that three levels of

trade existed in the home market. Pls.' Mem. at 32; Pls.' Reply at 12. According to

Baux:

> The only reasonable reading of the record was that Baux's home market consisted of three distinct LOTs: (1) factory direct sales from Baux to unaffiliated customers (LOT 1), (2) downstream sales that Baux's affiliate Bancolor processed and sold to unaffiliated customers (LOT 2), and (3) warehouse sales by Bancolor's Madrid DC to unaffiliated customers (LOT 3).

Pls.' Reply at 12.

As discussed above, Commerce "will determine that sales are made at different

levels of trade if they are made at different marketing stages (or their equivalent)." 19

C.F.R. § 351.412(c)(2). Commerce "carefully investigate[s] whether a level of trade

adjustment should be made" and "require[s] evidence from the foreign producers that

the functions performed by the sellers . . . are actually performed at the allegedly

different levels of trade." SAA at 829, 1994 U.S.C.C.A.N. at 4168; *see also Fujitsu Gen.*

*Ltd. v. United States*, 88 F.3d 1034, 1040 (Fed. Cir. 1996) (holding that Commerce

"reasonably place[s] the burden to establish entitlement to" a favorable LOT adjustment

on the respondent).

Commerce's determination that Plaintiffs failed to establish the existence of more than one level of trade in the home market is supported by substantial evidence.  In their questionnaire responses, Plaintiffs categorized their selling functions by intensity level and ranked them on a scale of zero to ten.  Baux Sec. A Resp. at Ex. A-19. Commerce asked Plaintiffs to support the rankings "both with source documentation and linkages to its accounting system"; however, Plaintiffs failed to do so.  I&D Mem. at 13 & n.49.  Commerce provided Plaintiffs with additional opportunities to document this information.  Baux Suppl. Sec. A Resp. at 7.  In their responses, Plaintiffs provided a confidential chart describing and ranking their selling functions.  *Id.* at 8.

Commerce examined all of Plaintiffs' responses, including this chart and ranking of the claimed selling functions, and determined that Plaintiffs' assertions as to the degrees of intensity at which they performed the selling functions were not supported by record evidence.  I&D Mem. at 12–14.  Commerce analyzed Plaintiffs' reported selling activities and determined that Plaintiffs had not provided evidence of meaningful differences in the chain of distribution in the home market between Baux and its affiliates' selling functions sufficient to demonstrate different levels of trade.  *Id.* at 11.

The purpose of a level of trade adjustment is "to ensure that the normal value and U.S. price are being compared . . . at the same level of trade, that is, at the same marketing stage in the chain of distribution that begins with the manufacturer."  *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314 (Fed. Cir. 2001).  Commerce found that the record evidence does not demonstrate that the levels of customer support provided by Baux and its affiliates were substantially different.  I&D Mem. at 16–17.  For

example, Baux and Bancolor both sold directly to unaffiliated customers during the POR.  Baux Sec. A Resp. at A-16–17.  When attempting to differentiate between the selling activities of Baux and its affiliates, Plaintiffs pointed to different quantities of sales, rather than any unique selling functions.  *Id.*

Plaintiffs maintain that their intensity level ranking is valid and cite to the selling activity of payment collection.  Pls.' Mem. at 40; Pls.' Reply at 17.  Plaintiffs assert that Bancolor and Madrid DC collected more payments and issued more invoices than Baux did during the POR.  Pls.' Mem. at 6.  To substantiate a level of trade adjustment based on a difference in selling activity, the purportedly different level of trade "must be characterized by an additional layer of selling activities, amounting in the aggregate to a substantially different selling function."  *Micron Tech.*, 243 F.3d at 1314 (citing *Preamble*, 62 Fed. Reg. at 27,371).  Here, Plaintiffs failed to explain and document why any differences in the number of transactions (reflected in the number of invoices issued and payments collected) between Baux and its affiliates constituted a difference in the level of trade, particularly when Commerce observed that the nature of the customers involved, that is, end-users, may overlap.  I&D Mem. at 15 & n.58.

Plaintiffs contend that Commerce also should have made an LOT adjustment because Bancolor processed the CAAS before selling it, either directly or through Madrid DC, which affects the type of customer to which the CAAS was sold.  Pls.' Mem. at 28–29.  Commerce addressed Plaintiffs' argument, explaining that the expenses associated with further processing CAAS were accounted for by a difference in merchandise ("DIFMER") adjustment and were not relevant to the LOT analysis.  I&D

Mem. at 16. "Commerce may only consider the expenses associated with [such] activities to the extent that they differ from those reported elsewhere in a company's response" and have not already been taken into account. I&D Mem. at 17.

When referencing Madrid DC's role in the sales of CAAS, Plaintiffs stated that Madrid DC's purpose "is to warehouse merchandise, slit, uncoil, cut to length, recoil, and conduct sales for smaller industrial and end user customers." Baux Sec. A Resp. at A-17. Commerce again explained that it made price adjustments for the selling activities of warehousing, repacking, and further processing, among others, and Plaintiffs failed to justify any further adjustment on the basis of the level of trade provision. I&D Mem. at 16; *see also* 19 C.F.R. § 351.401(b)(2) (stating that the agency "will not double-count adjustments"). Plaintiffs fail to identify any record evidence that reasonably detracts from Commerce's finding, and the court will not reweigh the evidence that Commerce reasonably addressed. *See Downhole Pipe & Equip., L.P v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015).

The burden of supporting a claim for a level of trade adjustment falls on the party, not the agency. In *NSK, Ltd. v. Koyo Seiko Co., Ltd.*, 190 F.3d 1321, 1330 (Fed. Cir. 1999), the investigated party presented evidence of different prices and selling expenses for the subject merchandise, but the court affirmed Commerce's denial of a level of trade adjustment because the respondent failed to provide evidence that the "differences were not caused by other factors, such as volume sold or arbitrary pricing practices." It is Plaintiffs, not Commerce, who have "the burden of supporting [their]

claim for a level of trade adjustment." *Fujitsu Gen. Ltd.*, 88 F.3d at 1046 (quotation marks omitted).

The SAA interprets the statute to require Commerce to "carefully investigate whether" an LOT adjustment should be made, because "level of trade adjustments may be susceptible to manipulation." SAA at 829, 1994 U.S.C.C.A.N. at 4168. To comply with the statute, Commerce had to "closely scrutinize" the evidence Plaintiffs presented to determine whether they were entitled to an additional adjustment for differences in level of trade. *Id.* Commerce requested documentation to support Plaintiffs' reported selling activities; however, Plaintiffs failed to provide support for the intensity levels it reported, and Commerce addressed Plaintiffs' remaining claims.

Because substantial evidence supports the agency's analysis of Plaintiffs' selling functions in the home market and its determination that only one LOT existed in the home market, the court will sustain Commerce's *Final Results*.

### CONCLUSION

For the reasons discussed above, the court will sustain Commerce's *Final Results*. Judgment will enter accordingly.

/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: September 25, 2025
          New York, New York